**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| URBAN ONE, INC. f/k/a RADIO ONE, INC., ) | |
| ) | |
| Plaintiff, ) | No. 17 C 7892 |
| ) | |
| v. ) | Hon. Virginia M. Kendall |
| ) | |
| DEAN TUCCI, ) | |
| ) | |
| Defendant. ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

This matter is before the Court on Plaintiff Urban One, Inc.'s (formerly known as Radio One, Inc.) Motion for a Preliminary Injunction against Defendant Dean Tucci. (Dkts. 7, 8). Also before the Court are Tucci's Motion to Strike Urban One's Motion For Preliminary Injunction, Vacate the Agreed Temporary Restraining Order, and Terminate the Hearing (Dkt. 22) and Tucci's Motion for Rule 12(h)(3) Determination of Subject Matter Jurisdiction (Dkt. 31). Finally, Tucci has filed a Motion to Seal (Dkt. 51), and Urban One has filed a Motion for a Determination of Whether Exhibits Shall be Filed Under Seal (Dkt. 56), both of which concern certain preliminary-injunction hearing exhibits including those that Tucci seeks to file under seal.

For the reasons explained below, Tucci's motions to strike and to dismiss for lack of subject matter jurisdiction (Dkts. 22, 31) are denied. Urban One's motion for a preliminary injunction (Dkts. 7, 8) is granted. Finally, the parties' motions regarding exhibit sealing (Dkts. 51, 56) are granted in part and denied in part. The exhibits at issue shall remain under seal until October 15, 2018. On that date, the parties shall submit a proposed agreed protective order and re-designate (and redact as necessary) the exhibits as appropriate under that proposed agreed order. Finally, this case is set for further status on November 14,, 2018.

## PROCEDURAL HISTORY

On November 1, 2017, Urban One filed the instant lawsuit against Tucci, seeking to hold him responsible for a default judgment entered in *Radio One, Inc. v. Direct Media Power, Inc.*, No. 16 C 1867 (N.D. Ill.) (the "*Radio One* Litigation"). The complaint contains two counts: an action to pierce the corporate veil of Direct Media Power, Inc. and DMP Holdings, Inc. (Count I) and fraud (Count II). (Dkt. 1). In support of these claims, Urban One alleges that Tucci engaged in an "elaborate fraudulent scheme to enrich himself and avoid Urban One's $1.4 million judgment" against Direct Media Power in the *Radio One* Litigation by moving assets and devising a complicated corporate structure to hide funds that Direct Media Power owed to Urban One. *Id.* at ¶ 2. Specifically, Urban One complains about the timing of the formation of DMP Holdings on February 25, 2016, just 23 days after the *Radio One* Litigation was filed, and Tucci's transfer of his ownership interest of Direct Media Power, TelDebt Solutions, Inc. and FDATR, Inc. ownership to that newly created entity. *Id.* at ¶¶ 13–14. Despite these formal ownership changes, Tucci continued to run Direct Media Power, TelDebt, and FDATR in the same way that he had done so previously, which included taking money out of the companies beyond his salary, paying personal expenses, transferring money among the companies to pay various debts, and paying family members out of the companies for no legitimate business reason. *Id.* at ¶ 18.

Urban One further alleges that after the default judgment was entered in the *Radio One* Litigation, Tucci transferred Direct Media Power's funds from accounts held at U.S. Bank to those held at Bank of America to avoid a hold on the accounts by way of the imminent citation procedure, leaving a total of only $687 across two accounts. *Id.* at ¶¶ 20–21. Urban One points to transfers of almost $400,000 to Tucci-affiliated companies TelDebt and Dang Enterprises, LLC and also to Tucci personally after the default judgment was entered. *See id.* at ¶¶ 23, 28.

A Citation to Discover Assets was served on Direct Media Power on November 11, 2016. Urban One alleges that Tucci transferred an additional $154,000 out of Direct Media Power to both Dang and himself after that date. *Id*. at ¶¶ 25. On November 21, 2016, instead of proceeding with the citation hearing as noticed by Urban One, Direct Media Power filed for Chapter 11 bankruptcy. Even during the bankruptcy proceedings, however, Tucci continued to transfer funds out of Direct Media Power and into his other entities or to himself (approximately $475,000), in violation of the bankruptcy court orders and budgets. *Id*. at ¶ 27. Ultimately, Urban One alleges that: (1) Tucci exercised complete dominion over Direct Media Power and DMP Holdings such that their separate corporate existence from him is only a fiction; and (2) Tucci caused Direct Media Power to fraudulently transfer more than $1 million to entities owned and controlled by Tucci after the default judgment was entered. As relief, Urban One seeks to hold Tucci personally liable for its judgment against Direct Media Power ($1,398,658.58) plus post-judgment interest and attorneys' fees in this action.

At the same time Urban One filed its Complaint, it moved for a temporary restraining order. *See* (Dkts. 7, 8). On November 2, 2017, the Court held a hearing on the motion and heard argument from both parties for more than two hours. *See* (Dkt. 14) (TRO Tr.). The Court found, analyzing the factors set forth in *Wachovia Sec., LLC v. Banco Panamericano, Inc.*, 674 F.3d 743 (7th Cir. 2012), that Urban One had shown—primarily through Tucci's deposition testimony—that Direct Media Power and DMP Holdings failed to observe corporate formalities, had a non-functioning corporate officer, and were missing corporate records. In addition, Urban One had shown there was a commingling of funds and a failure to maintain an arm's length relationship among the entities. *See* (Dkt. 14) (TRO Tr.) at 40–51, 65–66, 76–79. The Court further held that Urban One had shown by a preponderance of the evidence that the movement of funds between Tucci's

companies and out of Direct Media Power was "done in order to keep DMP insolvent, in order not to have money to pay [the *Radio One* Litigation] judgment," and therefore Urban One had shown a likelihood of success on the merits of its claim to pierce the corporate veil. The Court also held that Urban One had demonstrated an irreparable injury without an adequate legal remedy, and that public policy supported the issuance of a TRO because tolerating the abuse of a court order promotes injustice. *Id*. at 77–78. Accordingly, the Court issued a TRO including the following restraints:

1. Freezing Tucci's assets "with the exception of normal living expenses to include attorney expenses, which the Court may review upon motion by Urban One or upon *sua sponte* order of the Court"; and

2. Ordering Tucci to disclose to Urban One the bank accounts and personal financial records for the period February 2, 2016 to the present, by providing to counsel for Urban One a list of all bank accounts including account numbers and addresses and account holder names.

(Dkt. 13) (TRO). At the conclusion of the hearing, Tucci's counsel represented that Tucci's personal assets were already frozen on account of a default on $1.5 million in Direct Media Power loans that Tucci personally guaranteed and subsequent action by the creditors on those loans. (Dkt. 14) (TRO Hrg. Tr.) at 81:1–8. The parties later agreed to extend the TRO to January 10, 2018. (Dkt. 17).

The parties next appeared before the Court on November 17, 2017 to discuss a briefing schedule on the preliminary injunction. At that time, Urban One elected to stand on its Memorandum in Support of its Motion for Temporary Restraining Order (Dkt. 8). *See* (Dkt. 46) (11/17/17 Hrg. Tr.) at 5:12–17. Tucci submitted a brief in opposition to the motion for preliminary injunction (Dkt. 24) and Urban One submitted a reply brief. (Dkt. 36).

In January 2018, the Court held a three-day preliminary-injunction hearing in this matter and allowed the parties to present argument, witness testimony, and evidence supporting their

4

positions.  In addition to Tucci, the following former Direct Media Power employees testified: (1) Desiree Keller,[1] an accounting and payroll manager from November 2010 to May 2012 who then served as Tucci's executive and personal assistant from May 2012 to May 2017; (2) Brian Czahor, a senior account executive from 2010 until May 2017; (4) Anthony Maltese, an accountant from July 2016 to May 2017; and (5) Nathan Hays, the Director of Information Technology from July 2015 until May 2017.  The hearing provided the Court with the opportunity to determine the credibility of each witness through observation of their demeanors, including body language, tone of voice, facial expressions, mannerisms, and other indicative factors, as well as through the answers that each provided.  On this point, the Court has considered the following:  Currently, Keller and Czahor work together at a company owned by Czahor called BC Media and Associates that has a business similar to that of Direct Media Power and does business with Urban On;  both Keller and Czahor also are involved in a state court litigation matter against FDATR president Ken Halverson and Tucci; further, at the time of the hearing both Maltese and Hays were still employed by Tucci (Hays testified that he worked for a Tucci-owned entity named "National Media Calls"), and Maltese admitted to pleading guilty to theft of property in violation of 720 ILCS 5/16-1(b)(5), a Class 2 felony.

## FINDINGS OF FACT

Pursuant to Federal Rules of Civil Procedure 52(a)(2) and 65, the Court begins with a recitation of the facts pertinent to its analysis.  The Court relies on the parties' proposed findings (Dkts. 53, 55), the transcripts of hearing testimony, the parties' exhibits, and where necessary, the Court's assessment of witness credibility.

---

[1] Desiree Baker married in 2017 and subsequently changed her name to Desiree Keller.  For simplicity, she is referred to as Desiree Keller throughout this Opinion with the understanding that her name is reflected as Desiree Baker in the exhibits.

## A. The Parties

Urban One is a Delaware corporation with its principal place of business in Silver Spring, Maryland. (Dkt. 1) at ¶ 8; (Dkt. 50) at ¶ 8. Prior to May 2017, Urban One operated under the name "Radio One, Inc.." (Dkt. 1) at 1 n.1. Urban One is a broadcasting company that operates radio stations and sells airtime to broadcast commercials. Dean Tucci is an Illinois citizen. (Dkt. 1) at ¶ 9; (Dkt. 50) at ¶ 9.

## B. The Companies

Tucci owns, operates, and/or has in an interest in a web of corporate entities including Direct Media Power, DMP Holdings, TelDebt, FDATR, and Dang. Direct Media Power, TelDebt, and FDATR all operated out of two adjacent office suites (102A and 104C) in a building located at 199 South Addison Road in Wood Dale, Illinois.

### 1. Direct Media Power, Inc.

On April 7, 2010, Tucci incorporated a company named Direct Media Power, Inc. in Delaware. (Dkt. 34-8); (Dkt. 48) (Tr. Vol. 2) at 296:22–297:20 (Testimony of D. Tucci). According to the Delaware Division of Corporations website, only two filings have been made on behalf of Direct Media Power, Inc. during its existence: (1) a Certificate of Incorporation for Stock Corporation that was filed on April 7, 2010; and (2) a Certificate for Revival of Charter for a Voided Corporation that was filed on May 3, 2013. (Dkt. 34-8). As of March 1, 2016, the status for this entity has been "Void, AR's or Tax Delinquent." *Id.* The Delaware entity used the federal Employment Identification Number 27-2300595.

On May 21, 2013, Tucci incorporated a separate company with the same name—Direct Media Power, Inc.—in Illinois. *See* (Dkt. 34-1); PHX 3 (Illinois Corporation File Detail Report

for Direct Media Power, Inc.).[2]  This entity was involuntarily dissolved by way of bankruptcy proceedings on October 13, 2017.  *Id.*  The Illinois entity used the federal EIN 38-3907150.  Tucci testified that the Illinois Department of Employment Security required Direct Media Power to incorporate in Illinois.  (Dkt. 48) (Tr. Vol. 2) at 305:13–20.

Tucci testified that these two entities were essentially the same company, but also that they had separate federal EINs and boards of directors, kept separate bank accounts and filed separate tax returns.  *Id.* at 306:13–15, 308:21–309:6; *see also* (Dkt. 47) (Tr. Vol. 1) at 85:21–23 (Testimony of D. Keller).

Direct Media Power was a media liquidation company with some 30 to 35 employees at its peak and somewhere around 15 employees by the time it ceased operations in 2017.  (Dkt. 49) (Tr. Vol. 3) at 320:23–321:1 (Testimony of D. Tucci).  Direct Media Power would purchase unsold radio (and later television) airtime at a discount which it would then sell to its clients in two different ways—either by simply selling discounted airtime to advertisers or by buying the airtime itself, "arbitraging" the airtime (that is, broadcasting a toll-free telephone number for individuals who might need certain services like student loan refinancing or tax resolution) and then selling "the phone calls that came off of the toll-free numbers to clients."  (Dkt. 48) (Tr. Vol II) at 299:2–23 (Testimony of D. Tucci).  Tucci testified that in 2015, Direct Media Power liquidated $50 million of unsold radio commercial airtime for $12 million in revenues, and in 2016 for $7 million in revenues.  *Id.* at 298:16–24.

Tucci served as the President and CEO of Direct Media Power, as well as the single member of its board of directors.  (Dkt. 49) (Tr. Vol. 3) at 320:14–17, 327:6–7; *see* (Dkt. 48) (Tr.

---

[2] Citations to Urban One's and Tucci's preliminary-injunction hearing exhibits will be abbreviated to "PHX" and "DHX," respectively.

Vol. 2) at 300:20–21. Tucci drew a salary approximately $78,000 from Direct Media Power. *See* PHX 42 at 50 (2015 D. Tucci W-2 from Direct Media Power Illinois listing $75,000 in wages); (Dkt. 49) (Tr. Vol. 3) at 338:10–19. The only other Direct Media Power corporate officer as to whom evidence was adduced was David DeFranzo: Tucci testified that DeFranzo held the title of Chief Operating Officer from August to November 2015 and that he had been the chief marketing officer "for a number of years" prior. *See* (Dkt. 49) (Tr. Vol. 3) at 366:10–21; *see also* (Dkt. 25) (Tucci Decl.) at ¶ 25 (Direct Media Power organization chart listing DeFranzo as the COO for the period 2015–2016). Still, the hearing evidence indicated that Tucci was involved in all decisions made at Direct Media Power and he had complete control over its operations. *See* (Dkt. 47) (Tr. Vol I) at 24:6–11 (Testimony of D. Keller); *see also id.* at 13:16–18 ("Dean Tucci was the only person authorized to sign any checks for Direct Media Power or FDATR, any of his other entities, as well as any wire transfers."); *id.* at 24:4–5 ("Dean would get all copies of [the emails of] every employee at all companies."); *id.* at 124:15–18 (Testimony of D. Tucci) (only his signature could authorize checks and only he could authorize wire transfers); (Dkt. 48) (Tr. Vol. 2) at 197:8–10 (Testimony of B. Czahor) ("[Tucci] was like a dictator. He—you would—he would read every email that came in. All your phone calls were recorded. You were on camera."). *But see id.* at 284:14 (Testimony of N. Hays) ("[Tucci] has a pretty hands off [management] approach with me, actually.").

Tucci was also the sole owner of the company from its formation until February 2016. (Dkt. 47) (Tr. Vol I) at 111:4–6 (Testimony of D. Tucci); (Dkt. 49) (Tr. Vol. 3) at 324:7–18 (Testimony of D. Tucci) (all stock issued by Direct Media Power Illinois was issued to Tucci). On February 25, 2016, a new company was incorporated in Illinois—DMP Holdings, Inc.—and Tucci transferred his ownership of Direct Media Power to DMP Holdings as of February 26, 2016. *See*

(Dkt. 47) (Tr. Vol. 1) at 1–3 (Testimony of D. Tucci); (Dkt. 49) (Tr. Vol. 3) at 361:8–10 (Testimony of D. Tucci).

Tucci testified that he never had a board of directors meeting for Direct Media Power nor had he ever paid a formal dividend out of the company. *See* (Dkt. 47) (Tr. Vol. 1) at 176:2–9; (Dkt. 48) (Tr. Vol. 2) at 309:14–17 ("Were there times when Direct Media Power acted by the unanimous consent of the board of directors in lieu of a meeting? A. I'm not sure."); (Dkt. 49) (Tr. Vol. 3) at 361:5–7 ("Q. . . . You have never issued any dividends out of DMP . . . , true? A. True."). He further testified that he had made capital contributions to the company in the form of only $150,000 in 2015 and a personal guarantee of a more than $1 million loan at some unspecified time. (Dkt. 49) (Tr. Vol. 3) at 326:1–13.

According to the evidence at the hearing, Direct Media Power maintained four bank accounts—two at U.S. Bank, ending in 8690 and 9293, and two at Bank of America ("BOA"), ending in 6543 and 6530. The evidence demonstrated that the BOA accounts were linked to the Illinois entity, *see* PHXs 11–14 (BOA account opening documents); testimonial evidence indicated that the U.S. Bank accounts were opened in 2010 for the Delaware entity and that they retained the EIN of the Delaware entity. (Dkt. 47) (Tr. Vol. 1) at 90:22–91:4 (Testimony of D. Keller); (Dkt. 48) (Tr. Vol. 2) at 306:16–307:6 (Testimony of D. Tucci). No documentary evidence was presented regarding the ownership of the U.S. Bank accounts.[3]

As for records, Direct Media Power tracked its financial transactions on "in/out" reports, which were Excel spreadsheets maintained by its accounting staff that contained information from Direct Media Power's bank statements. (Dkt. 47) (Tr. Vol. 1) at 29:6–30:13 (Testimony of D.

---

[3] However, the Court notes that in the bankruptcy proceedings, the Direct Media Power entity at issue there (the Illinois entity) represented to the Bankruptcy Court that it "owned or controlled" all of the following accounts: BOA 6530, U.S. Bank 8960, U.S. Bank 9293, BOA 6556, and BOA 6543. *In re Direct Media Power, Inc.*, No. 16-36934 (Dkt. 77) (Bankr. N.D. Ill. Jan. 17, 2017).

Keller); *see* PHX 4A (DMP out report for BOA 6530 & U.S. Bank 8690 for 3/1/17 to 4/5/17),

PHX 4D (DMP U.S. Bank 8690 in report for 1/4/16 to 12/30/17), PHX 4E (DMP U.S. Bank 8690

out report for 1/4/16 to 2/28/17), PHX 4F (DMP BOA 6530 in report for 1/4/16 to 12/30/17), PHX

4G (DMP BOA 6530 out report for 12/18/15 to 2/28/17/17), PHX 4H (DMP BOA 6543 in report

for 8/31/15 to 2/27/17), PHX 4I (DMP BOA 6543 out report for 8/31/15 to 1/10/17) (containing

mostly payroll debits).

Direct Media Power also maintained certain financial information in QuickBooks

accounting software (such as vendor invoices and banking data) but Tucci generally did not

consider the QuickBooks data to be accurate. (Dkt. 49) (Tr. Vol. 3) at 367:20–22 (Testimony of

D. Tucci) ("Q. But DMP did not rely on its QuickBooks records because they were inaccurate,

true? A. That is true."). Aside from bank statements and in/out reports, no other financial

documents or corporate records of Direct Media Power were introduced at the hearing, although

Tucci testified as to the existence of articles of incorporation and also that stock certificates, annual

reports, employee payroll records and taxes, "accounting records," "records of sales," "records of

contracts," and tax returns also were kept. *See* (Dkt. 49) (Tr. Vol. 3) at 324:7–18, 327:4–5, 332:14–

333:11, 378:2–10. At the same time, Urban One elicited testimony from Tucci that the only

financial record maintained by Direct Media Power was the in/out report:

> Q. So let's talk about corporate records for a moment.
>
> You never produced any minute books, board of directors meeting minutes for DMP or DMP Holdings, true?
>
> A. I don't believe so, no.
>
> Q. Okay. And the only financial record that you maintained for DMP was that spreadsheet, that in-and-out spreadsheet that we—that we showed you, correct?
>
> A. That is correct.

(Dkt. 47) (Tr. Vol. 1) at 175:9–16.  Keller testified that Direct Media Power did not voluntarily file its tax returns for the years 2014, 2015, and 2016; it began filing those returns when the Internal Revenue Service commenced an audit of Direct Media Power.  (Dkt. 47) (Tr. Vol. 1) at 98:6–17.  Tucci confirmed that the 2014 tax return was not filed and that the IRS "filed" SFRs (Substitutes for Returns) on Direct Media Power's behalf at some point.  (Dkt. 49) (Tr. Vol. 3) at 363:6–364:16.

### 2.  DMP Holdings, Inc.

DMP Holdings, Inc. is an Illinois corporation.  *See* PHX 2 (Illinois Corporation File Detail Report for DMP Holdings, Inc.).  Tucci owns 90% of DMP Holdings; Beata Piliciauskiene—Tucci's significant other—owns the other 10%, which she acquired for no consideration.  Immediately after DMP Holdings was formed, Tucci transferred his ownership of Direct Media Power, TelDebt, and FDATR to that entity.  *See* (Dkt. 47) (Tr. Vol. 1) at 112:1–115:1 (Testimony of D. Tucci); (Dkt. 49) (Tr. Vol. 3) at 324:19–325:18 (Testimony of D. Tucci).  Even so, DMP Holdings was without a bank account from the time it was formed until sometime in January 2017, and at that time the account had a zero balance.  (Dkt. 47) (Tr. Vol. 1) at 117:23–118:12.  Likely for this reason, no in/out reports or other financial records were kept for DMP Holdings.  *Id.* at 175:24–176:1 (Testimony of D. Tucci).  Still, Tucci testified that DMP Holdings was solvent in January 2018.  (Dkt. 49) (Tr. Vol. 3) at 329:1–2.  Tucci did not maintain a joint bank account with DMP Holdings.  *Id.* at 331:24–332:4.

Tucci testified that DMP Holdings enacted articles of incorporation and issued corporate stock.  *Id.* at 325:19–23, 327:12–14.  As for management, Keller testified that the board of directors for DMP Holdings included herself, a few of Tucci's children, and Piliciauskiene.  (Dkt. 47) (Tr. Vol. 1) at 26:9–14; *see also* (Dkt. 49) (Tr. Vol. 3) at 327:17–19 (Testimony of D. Tucci) (testifying that the board of directors for DMP Holdings "originally was myself and Desiree [Keller].  We

never did anything formal after that.").  Tucci testified that he never had a board of directors

meeting for DMP Holdings nor had he ever paid a formal dividend out of the company.  *See* (Dkt.

47) (Tr. Vol. 1) at 176:2–9; *see also id.* at 26:15-21 (Testimony of D. Keller) (testifying that DMP

Holdings never held a board of directors meeting).

According to Tucci, DMP Holdings was created with the intent of raising capital for

FDATR by soliciting outside investors and had registered with the U.S. Securities and Exchange

Commission.  (Dkt. 49) (Tr. Vol. 3) at 327:20–328:14.  And yet, DMP Holdings "did not raise

additional capital from outside investors."  (Dkt. 55) at ¶ 13.  After the creation of DMP Holdings,

the corporate structure was set up in the following manner:



### 3. FDATR, Inc. & TelDebt Solutions, Inc.

FDATR, Inc. was incorporated in Delaware in April 2010, originally as Tel-Debt

Solutions, Inc. prior to its official renaming.  DHX 2 (Delaware Dep't of State: Division of

Corporations Entity Details for FDATR, Inc.).  Its business is tax preparation and resolution as

well as student loan consolidation.  (Dkt. 49) (Tr. Vol. 3) at 322:24–323:7 (Testimony of D. Tucci);

*see also* (Dkt. 47) (Tr. Vol. 1) at 114:19–20 (Testimony of D. Tucci) (company began as a "lead

aggregator" and did business-to-business work).  At times, FDATR was a client of Direct Media

Power and purchased calls Direct Media Power received from its toll-free-number service advertisements. (Dkt. 49) (Tr. Vol. 3) at 337:2–16, 338:3–9 (Testimony of D. Tucci); (Dkt. 48) (Tr. Vol. 2) at 201:20–21 (Testimony of B. Czahor) ("Q. Does DMP and FDATR work together at all? A. Yes. Supposedly, they buy media for FDATR."). Tucci was originally the sole owner and president of FDATR, but in February 2016, ownership was transferred to DMP Holdings and later in 2016, Ken Halverson became the president. (Dkt. 49) (Tr. Vol. 3) at 323:8–15. Still, Keller testified that Halverson lacked control over FDATR's bank accounts; that authority continued to rest with Tucci. (Dkt. 47) (Tr. Vol. 2) at 40:1–7. Tucci attested that in July 2017, FDATR's ownership was transferred to Halverson. (Dkt. 25) (Tucci Decl.) at ¶ 3.

According to Tucci, FDATR and TelDebt entities were also separately incorporated in Illinois, although the distinction among these companies is less than clear and does not appear to have been respected. (Dkt. 49) (Tr. Vol. 3) at 316:23–317:4; *see also* (Dkt. 47) (Tr. Vol. 1) at 27:23–23 (Testimony of D. Keller) ("There are, however, multiple EIN numbers for TelDebt Solutions and FDATR Incorporated in Illinois and in the State of Delaware."), 104:3–11. For instance, Tucci testified that FDATR and TelDebt were and currently are the same entity. (Dkt. 47) (Tr. Vol. 1) at 114:22–115:1. Somewhat confusingly, however, FDATR and TelDebt appear to have maintained different bank accounts and have separate federal EINs: U.S. Bank 9301 (FDATR), U.S. Bank 7542 (TelDebt), BOA 6556 (TelDebt), and Citi 6695 (FDATR).

In/out reports were maintained for TelDebt and FDATR. *See* PHXs 6B & 6D (FDATR U.S. Bank 9301 & Citi 6695 out reports), PHXs 6A & 6C (FDATR U.S. Bank 9301 & Citi 6695 in reports); PHX 6E (TelDebt BOA 6556 in report); PHX 6F (TelDebt BOA 6556 out report); PHX 6G (TelDebt U.S. Bank 7452 in report); PHX 6H (TelDebt U.S. Bank 7452 out report). Tucci was not an employee of any of these companies. (Dkt. 47) (Tr. Vol. 1) at 130:9–11.

### 4.  Dang Enterprises, LLC

Tucci established Dang Enterprises, LLC under New Mexico law in 2010. Tucci is the sole member of this LLC. *Id.* at 119:17–120:7, 121:3–8 (Testimony of D. Tucci). From the time of its formation until May 2017 (when Direct Media Power was liquidated), Dang did not have any operations. It did not have any employees and it did not file any tax returns. *See id.* at 121:22–25; 122: 3–11; *id.* at 28:14–17 (Testimony of D. Keller) (Dang "didn't start operating until after the Chapter 7 bankruptcy," "it was a dormant company that was just a backup"). Dang maintained one bank account at U.S. Bank ending 9319 (of which Tucci was a joint owner) and there are in/out reports for this company. *See* PHX 4J (Dang U.S. Bank 9319 in report for 10/28/16 to 2/17/17), PHX 4K (Dang U.S. Bank 9319 out report for 10/31/16 to 2/14/17).

### C.  Intercompany Transfers

The evidence adduced at the hearing reflected various transfers between Tucci's entities with little formality and with no corporate documentation outside of the in/out reports. Specifically, loans, advances, and other transfers between Direct Media Power, Tucci, FDATR, TelDebt, and/or Dang were recorded on the in/out report simply as "intercompany transfers." *See* (Dkt. 48) (Tr. Vol. 2) at 240:16–241:1 (Testimony of A. Maltese) ("Sometimes [the transfers] would be for cash flow purposes to be able to make payroll or pay vendors."). Tucci testified that there were no agreements created or kept that corresponded to the intercompany transfers. (Dkt. 47) (Tr. Vol. 1) at 148:21–149:3.

The transfers went both into and out of Direct Media Power. Keller provided the following testimony:

> Q.  Now, did [Tucci] ever ask you to move money between those companies?
>
> A.  Yes. Essentially money would move, depending on whichever business was bringing in more cash flow that day. If FDATR had a good day and we needed to make payroll or pay something for Direct Media Power, then

14

there would be money moved. It would usually be a check cut from Anthony Maltese or whoever was in the accounting department moving money from FDATR to Direct Media Power or from Direct Media Power to Dang Enterprises, Dean Tucci, wherever it needed to go.

*Id.* at 31:13–22. For his part, Tucci confirmed that Direct Media Power payroll sometimes was paid out of FDATR due to a shortage of funds in Direct Media Power. *Id.* at 146:1–3, 148:2–20; *see* PHX 6B (FDATR out report for 2/28/17 to 4/5/17 for listing checks to Direct Media Power employees); PHX 37B (statements for FDATR account U.S. Bank 9301); *see also* PHX 6F (TelDebt BOA 6556 out report) (reflecting payroll checks for DMP employees in December 2016). Czahor also testified to the payroll transfers between these companies: "In the beginning when FDATR started, we supported them on payroll, Dean Tucci told me personally. And then towards the end when Direct Media Power had their issues with the Radio One case and the bankruptcy case, then they were supporting us in payroll." (Dkt. 48) (Tr. Vol. 2) at 21–25.

Like payroll, Tucci testified that the other entities paid Direct Media Power's obligations at times, such as in mid-March through May 2017, FDATR paid $116,513 of Direct Media Power debts. (Dkt. 47) (Tr. Vol. 1) at 162:22–163:3; *see also* (Dkt. 25) (Tucci Decl.) at ¶ 2. Specifically, he stated that "if the funds [from other entities] were coming into the firm, they were used to help Direct Media Power pay bills. Vice versa, they were paying Direct Media Power bills." (Dkt. 49) (Tr. Vol. 3) at 339:22–25. Along these same lines, Tucci testified that cash re-deposited into Dang was used as a payroll and media expense payment provider, as it "was paying media bills for DMP." (Dkt. 47) (Tr. Vol. 1) at 168:19–169:12. The in/out reports show substantial funds into and out of Direct Media Power's accounts. *See, e.g.*, PHX 4D (DMP U.S. Bank in report for 1/4/16 to 12/30/17) (showing, for example, six deposits totaling $85,000 from 10/31/16 to 11/2/16 from FDATR and Dang); PHX 4E (DMP U.S. Bank 8690 out report for 1/4/16 to 2/28/17) (showing, for example, transfers of $25,000 to DMP's BOA accounts on 10/27/16, $162,000 to Dang on

10/28/16, $22,000 to Dang on 10/31/16, $60,000 to Dang on 11/3/16, $20,000 to Dang and $10,000 to a DMP BOA account on 11/4/16, and $69,000 to Dang and $35,000 to a DMP BOA account on 11/14/16); PHX 4F (DMP BOA 6530 in report for 1/4/16 to 12/30/17); 4H (DMP BOA 6543 in report for 8/31/15 to 2/27/17) (with the exception of a small handful of entries, intercompany transfers were the only deposits); PHX 6E (TelDebt BOA 6556 in report for 1/5/16 to 2/22/17) (showing $720,434.36 in deposits, largely from intercompany transfers from DMP BOA 6530 & 6543 and TelDebt U.S. Bank 7542 accounts).

Tucci testified that only his signature could authorize checks and only he could authorize wire transfers. (Dkt. 47) (Tr. Vol. 1) at 124:15–18; *see also, e.g.*, (34-4) (BOA Business Signature Card for account 6543 (Direct Media Power Illinois d/b/a DMP Teleservices)); PHX 14 (same); PHX 12 (BOA Business Signature Card for 6530 (Direct Media Power Illinois)); PHX 16 (BOA Business Signature Card for account 6556 (TelDebt Illinois)). Maltese likewise testified that Tucci's signature was required on all checks to pay vendor invoices, although some kinds of electronic media buys could be done without Tucci's signature. (Dkt. 48) (Tr. Vol. 2) at 235:15–238:5. And although testimony was offered regarding the specifics of the signature—it was on a stamp that certain employees could use—Tucci testified that his approval was required before the signature stamp was applied and that after the bankruptcy proceedings were initiated for Direct Media Power, he personally stamped "everything." (Dkt. 49) (Tr. Vol. 3) at 322:1–15.

**D.  Personal Transfers**

Tucci was an employee of Direct Media Power who received both payroll salary and commission payments, although Tucci could not elaborate what his commission deal was. (Dkt. 49) (Tr. Vol. 3) at 362:3–17. He also testified that he received shareholder distributions from Direct Media Power, although he confirmed that after February 2016, he was no longer a

shareholder in Direct Media Power, having transferred his ownership to DMP Holdings, Inc. *Id.* at 361:8–14. In addition to these items, the in/out reports for all of the entities—not just Direct Media Power—reflect voluminous "intercompany transfers" made to Tucci's personal bank accounts at U.S. Bank (9216 and 7601) for the years 2016 and 2017. For example, Tucci acknowledged more than $100,000 of transfers into U.S. Bank 9216 directly from Direct Media Power in 2016, the same year that Tucci ceased being a shareholder of Direct Media Power. He could not recall why he had received this amount. *See* (Dkt. 47) (Tr. Vol. 1) at 132:19–133:20. Similarly, Tucci confirmed prior testimony that he had received approximately $100,000 in income from TelDebt in distributions: "If I borrow money on the firm and I want to pay myself, I can," even though he was not a shareholder of TelDebt at the time and these monies were not considered repayments of debts. (Dkt. 47) (Tr. Vol. 1) at 134:6–25.

In fact, in/out reports for Tucci's U.S. Bank 9216 were maintained by Direct Media Power and admitted as evidence, with the in report containing five pages of "intercompany transfers" from corporate accounts for Direct Media Power, Dang, FDATR, and TelDebt to Tucci's personal checking account for the period January 2016 to March 2017 totaling $274,461.96. *See* PHX 4B (Tucci U.S. Bank 9216 in report for 1/4/16 to 3/16/17); *see also* (Dkt. 47) (Tr. Vol. 1) at 136:14–17 (Testimony of D. Tucci); PHX 35B (Statements for U.S. Bank 9216 for 1/2016 through 6/2017) (reflecting numerous monthly deposits from bank accounts associated with Direct Media Power, TelDebt, FDATR, and Dang); PHX 4C (Tucci U.S. Bank 9216 out report detailing personal expenses).

Similarly, an in/out report maintained by Direct Media Power for U.S. Bank 7601 (another personal account held by Tucci and Piliciauskiene) reflects $109,692.91 in "intercompany transfers" to the account during 2016. *See* PHX 4L (Tucci U.S. Bank 7601 in report for 1/11/6 to

12/8/16); *see also* PHX 29B (statements for U.S. Bank 7601 for 1/20/2016 to 12/15/2016) (reflecting numerous monthly deposits from bank accounts associated with Direct Media Power, TelDebt, and FDATR). At the hearing, Tucci testified that the transfers into U.S. Bank 7601 reflected reimbursements for business expenses and that the bank statements served as his "expense reports." (Dkt. 47) (Tr. Vol. 1) at 143:6–144:7.

Tucci also directed "intercompany transfers" and other funds to his family members. For example, Piliciauskiene received an annual salary of $60,000 from Direct Media Power, although Keller testified that Piliciauskiene did not work at Direct Media Power. (Dkt. 47) (Tr. Vol. 1) at 32:22–23; *see also* PHX 42 at 36 (Piliciauskiene 2015 W-2). In addition, checks were cut from Direct Media Power to cover Piliciauskiene's expenses such as rent (*see* (Dkt. 47) (Tr. Vol. 1) at 32:7–10. (Testimony of D. Keller)) and deposits were made into Piliciauskiene's personal checking account by both Direct Media Power (U.S. Bank 8690) and TelDebt (U.S. Bank 7542). *See* PHX 31B (1/20/16 to 8/17/17 statements for U.S. Bank 7959 held by Piliciauskiene and Tucci).

Company transfers also were made from Direct Media Power (U.S. Bank 8690), TelDebt (U.S. Bank 7542), and FDATR (U.S. Bank 9301) to a checking accounts held jointly by Tucci and his daughter and Tucci and his son, for which Tucci testified there were no legitimate business purposes. *See* PHX 30B (1/20/16 to 10/17/17 statements for U.S. Bank 3610); PHX 39B (1/15/16 to 10/13/17 statements for U.S. Bank 5780); *see also* (Dkt. 47) (Tr. Vol. 1) at 139:16–141:8. Finally, Keller testified that checks were also cut from Direct Media Power to cover "unallocated support" of $4,400 to Tucci's ex-wife each month. (Dkt. 47) (Tr. Vol. 1) at 32:10–13; *see also* PHX 6F (TelDebt BOA 6556 out report) (reflecting a $4,400 check to Sonia Tucci, a $500 check to Tucci, and a $150.00 check to Tucci's daughter all on 12/2/16).

18

### E. The Radio One Contract

Backing up to where the dispute in the instant matter originated, on June 12, 2013, Direct Media Power submitted a Confidential Credit Application to Urban One to purchase radio airtime from Urban One. Tucci and DeFranzo executed the Application on behalf of Direct Media Power. Through the Application, Direct Media Power agreed to tender payments within 30 days from the invoice date and to pay collection costs and legal fees if payments were not timely made, among other things. *See* PHX 50 (Confidential Credit Application). Direct Media Power immediately began purchasing airtime from Urban One to resell to its own clients. *See Radio One, Inc. v. Direct Media Power, Inc.*, No. 16 C 1867 (Dkt. 1) at ¶ 7 (N.D. Ill. Feb. 2, 2016) ("Radio One Complaint").

Urban One invoiced Direct Media Power monthly for its media purchases. Direct Media Power consistently paid the invoices until September 2014. Although it had stopped regularly paying the invoices, Direct Media Power continued to purchase airtime from Urban One and Urban One continued to broadcast commercials for Direct Media Power's clients during the purchased airtime. For his part, Tucci testified that Direct Media Power had discovered some losses with the Radio One account and had affirmatively "suspended" the relationship to investigate, after which time DeFranzo left and the Radio One relationship broke down. (Dkt. 48) (Tr. Vol. 2) at 302:5–303:16. At a certain point, Urban One demanded the amount due ($1,363,810.45) and Direct Media Power refused to pay. Radio One Complaint at ¶¶ 8–14.

### F. The Lawsuit

On February 2, 2016, Urban One filed suit against DMP for breach of contract and unjust enrichment. (Dkt. 47) (Tr. Vol. 1) at 111:14–19 (Testimony of D. Tucci); *see also* Radio One Complaint. On October 26, 2016, after Direct Media Power failed to participate in discovery, respond to motion practice, and appear for court hearings, the Court entered a default judgment

against it in the amount of $1,398,658.58 (which included the principal amount due under the contract, attorneys' fees and costs) plus post-judgment interest. *See Radio One, Inc. v. Direct Media Power, Inc.*, No. 16 C 1867 (Dkt. 38) (N.D. Ill. Oct. 26, 2016); *see also id.* (Dkts. 32, 34, 37). Neither Tucci nor Direct Media Power dispute that money is owed by Direct Media Power to Urban One. *See* (Dkt. 48) (Tr. Vol. 2) at 304:1–10 (Testimony of D. Tucci).

G.    **The Post-Judgment Discovery Proceedings**

Between the date of the default judgment and November 11, 2016, the in/out reports reflect that Direct Media Power transferred $354,000 from U.S. Bank 8690 to Dang. *See* PHX 4J (Dang in report for U.S. Bank 9319 for 10/28/16 to 2/17/17); (Dkt. 47) (Tr. Vol. 1) at 163:12–164:6 (Testimony of D. Tucci). During that same time period, Dang then transferred $4,000 to accounts held by Tucci, $180,000 to the FDATR U.S. Bank 9301 account, and $15,000 back to the Direct Media Power U.S. Bank 8690. *See* PHX 4K (Dang out report for U.S. Bank 9319 for 10/31/16 to 2/14/17).

On November 11, 2016, the original citation to discover assets in the *Radio One* Litigation was served on Direct Media at approximately 3:00 p.m. to Keller. The citation noticed an examination for November 21, 2016. *See* (Dkt. 1-3) (Citation Notice); (Dkt. 1-4) (Affidavit of Special Process Server); (Dkt. 47) (Tr. Vol. 1) at 41:10–42:19 (Testimony of D. Keller). Between November 11 and 21, Direct Media Power transferred $151,000 to Dang from U.S. Bank 8690 and BOA 6530. *See* PHX 4J (Dang in report for U.S. Bank 9319); (Dkt. 47) (Tr. Vol. 1) at 163:12–164:6 (Testimony of D. Tucci).

H.    **The Bankruptcy**

On November 21, 216, Direct Media Power initiated a voluntary Chapter 11 bankruptcy proceeding. *See In re Direct Media Power, Inc.*, No. 16-36934 (Dkt. 1) (Bankr. N.D. Ill. Nov. 21,

2016). Tucci testified that Direct Media Power was insolvent in late 2016 and 2017. *See* (Dkt. 47) (Tr. Vol. 1) at 176:10–17.

During the course of the bankruptcy proceedings, the Bankruptcy Court entered at least four interim cash collateral orders on December 19, 2016, January 12, 2017, February 6, 2017, and February 13, 2017. After each order, however, details of Direct Media Power's noncompliance and mismanagement surfaced and the proceedings were eventually converted to a Chapter 7 action on Direct Media Power's motion in March 2017. *In re Direct Media Power*, Inc., 582 B.R. 739, 748 (Bankr. N.D. Ill. 2018). The bankruptcy proceeding was dismissed on September 20, 2017 on the basis of the Trustee's conclusion that "there was no business justification for pursuing the assets of DMP and that the bankruptcy estate was administratively insolvent." *Id*. Urban One continued with its citation proceedings in the *Radio One* Litigation following the dismissal of the bankruptcy case and filed the instant action. Still, the bankruptcy court retained jurisdiction to decide Urban One's motion for contempt and granted the motion on March 29, 2018. The Court held:

> Throughout the bankruptcy case, DMP acted in a manner inconsistent with its obligations as a debtor, and those actions were personally performed by Tucci. He was the officer responsible for DMP's compliance. DMP's misuse of cash collateral, however, was particularly egregious as it actively impeded the purpose of the bankruptcy case. None of the Cash Collateral Orders authorized payments to the Affiliated Entities. None of them permitted the excessive payments to Tucci or on account of prepetition claims. None of them permitted DMP to comingle its cash, or to fail to account for it. Despite the specific prohibition on transfers by Affiliated Entities contained in the Third Collateral Order and Fourth Collateral Order, Tucci continued to transfer funds as he pleased between himself, DMP and Affiliated Entities.

*Id*. at 753. In imposing sanctions of Urban One's reasonable attorneys' fees, the bankruptcy court held Direct Media Power and Tucci personally jointly and severally liable, because "Tucci was DMP's head officer and, as such, responsible for its actions. He kept the books and controlled the

accounts. He exerted control over DMP's daily operations and authorized every transaction. It was Tucci's own actions that created the noncompliance by DMP." *Id*. at 753–54.

<u>DISCUSSION</u>

Just before the preliminary injunction hearing, Tucci filed two motions attacking these proceedings, which the Court took under advisement: a motion to dismiss the entire matter for lack of subject matter jurisdiction and a motion to strike the preliminary injunction hearing, arguing that the Court is without authority to grant relief. (Dkts. 22, 31). Accordingly, the Court analyzes these motions before turning to Urban One's preliminary injunction motion.

**I.** **Tucci's Motion to Dismiss for Lack of Subject Matter Jurisdiction (Dkt. 31)**

The Court first addresses Tucci's motion to dismiss the action pursuant to Federal Rule of Civil Procedure 12(h)(3) for lack of federal subject matter jurisdiction. *See* (Dkt. 31). In this case, Urban One asserts that the Court has jurisdiction based on diversity of citizenship. *See* 28 U.S.C. § 1332(a). Federal courts have jurisdiction only where there is *complete* diversity: the plaintiff's citizenship must be diverse from that of each named defendant. 28 U.S.C. §§ 1332(a). A corporation, for diversity purposes, is "deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business." 28 U.S.C. § 1332(c)(1); *see Hertz Corp. v. Friend*, 559 U.S. 77, 80 (2010). A corporation's "principal place of business" refers to the place where a corporation's officers direct, control, and coordinate the corporation's activities, *i.e.*, its "nerve center," which will typically be found at its corporate headquarters. *Hertz Corp.*, 559 U.S. at 92–93. Urban One alleges that the requirements of diversity jurisdiction are satisfied in this action, which it—a citizen of Delaware and Maryland—has brought against a single Illinois citizen, Tucci. *See* (Dkt. 1) at ¶ 10. Rule 12(h)(3) provides that "[i]f the court determines at any time that it lacks subject-matter jurisdiction,

the court must dismiss the action." The Court considers the entire record in evaluating the existence of diversity jurisdiction. *See Harmon v. OKI Sys.*, 115 F.3d 477, 479–80 (7th Cir. 1997).

Tucci argues that "[s]ince Urban One is seeking to treat [him] as the alter ego of Direct Media [Power], for purposes of diversity jurisdiction, [Tucci] is considered a citizen of his alter ego corporation." (Dkt. 31) at 2. According to Tucci, DMP is a citizen of Illinois *and Delaware* because it has been incorporated in both states; there is no dispute that DMP maintained its principal place of business in Illinois. Therefore, Tucci argues that he is not diverse from Urban One and the case must be dismissed. *Id.* In response, Urban One asserts that the Illinois and Delaware Direct Media Powers are separate and distinct corporations. *See* (Dkt. 34) at 1–2. As relevant, Urban One argues that only the Illinois-incorporated Direct Media Power did business with Urban One and later filed for bankruptcy, and therefore Urban One contends that only the Illinois-incorporated entity should be considered for the purposes of this matter. *Id.* at 3.

Tucci's argument that the parties in this action are not diverse fails for a number of reasons. When subject matter jurisdiction is challenged, the Court first looks to the face of the complaint to verify that the elements of diversity jurisdiction are satisfied. *See NLFC, Inc. v. Devcom Mid–America, Inc.*, 45 F.3d 231, 237 (7th Cir. 1995); *see also Adams v. Catrambone*, 359 F.3d 858, 861 (7th Cir. 2004) (concluding that diversity jurisdiction existed on the face of the complaint). The complaint as drafted by Urban One satisfies the requirements of diversity jurisdiction under 28 U.S.C. § 1332. Despite this fact, Tucci contends that diversity cannot be established because of his belief that Urban One's possible success on the merits will make Tucci a citizen of all of the states in which his disregarded corporate entity is a citizen. *See* (Dkt. 31). But the possibility that Urban One may succeed on the merits of its claim is not sufficient to destroy diversity. *See Pyramid Sec. Ltd. v. IB Resolution, Inc.*, 924 F.2d 1114, 1120 (D.C. Cir. 1991) (rejecting the

suggestion that because Pyramid's substantive claim involved piercing the corporate veil, consistency required the court to do so for purposes of determining diversity); *cf. Bell v. Hood*, 327 U.S. 678, 682 (1946) ("Jurisdiction, therefore, is not defeated as respondents seem to contend, by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover."). And contrary to Tucci's claim, "veil-piercing is a rule of liability—a means of determining who pays for wrongdoing—not a basis on which to determine citizenship for diversity purposes." *Golin v. Neptune Mgmt. Corp.*, 704 F. App'x 591, 594 (7th Cir. 2017).

Second, the citizenship attribution rule, described in an Eastern District of New York case cited by Tucci in his motion (*see* (Dkt. 31) at 2 (citing *Grunblatt v. UnumProvident Corp.*, 270 F. Supp. 2d 347, 352 (E.D.N.Y. 2003)), was developed by the Fifth Circuit more than thirty years ago and stands for the proposition that, for diversity jurisdiction purposes, if a parent and subsidiary corporations are deemed alter egos, the citizenship of each one of them is attributed to the other. This way, new places of citizenship are added to each corporate entity and federal jurisdiction is limited. *See Freeman v. Northwest Acceptance Corp.*, 754 F.2d 553 (5th Cir. 1985); *Panalpina Welttransport GmbH v. Geosource, Inc.*, 764 F.2d 352, 354 (5th Cir. 1985) (a corporation "may also gain additional places of citizenship for purposes of diversity jurisdiction . . . if it is the alter ego of another corporation."). Not only has the Court been unable to locate Seventh Circuit caselaw adopting this rule, the cases that have followed it since its introduction appear to have applied citizenship attribution only to other *corporations. See, e.g.*, *Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1346 (11th Cir. 2011) ("*Freeman*'s logic is inapposite when applied to individuals."). Tucci has not cited any authority (persuasive or otherwise)—and the Court likewise has not located any—that has attributed the citizenship of an

24

alter ego corporation to an individual. *Cf. Grunblatt*, 270 F. Supp. 2d at 352 ("Two corporations that are deemed to be an alter ego of each other acquire the citizenship of each other.").

Even if he had, the Court finds that the Delaware and Illinois entities were separate, and that only the Illinois entity is implicated in these proceedings, such that, if any citizenship attribution were to flow from Direct Media Power to Tucci upon the possible piercing of the corporate veil, such attribution would be of Illinois citizenship only and therefore would not destroy diversity.

Contrary to Tucci's current assertion that Direct Media Power was a single corporation that was incorporated in two different states ((Dkt. 31) at 1–2), Tucci himself testified "[i]t was two corporations. There was a corporation started in 2010 in Delaware, and then one started in 2014 [sic] in Illinois." (Dkt. 33-2) (1/31/17 Tucci Dep. in No. 16 BK 36934) at 7:12–14. Further, in his Proposed Findings of Fact and Conclusions of Law, Tucci states that the "Direct Media Illinois default judgment in the Radio One Action was entered against the Illinois incorporated entity . . .." and he argues that all post-judgment pre-bankruptcy transfers out of Direct Media Power were from the Delaware entity not the Illinois entity. (Dkt. 55) at ¶¶ 121, 123–26. Tucci cannot have it both ways, arguing that Direct Media Power is a single corporation with dual states of incorporation for jurisdictional purposes but also two separate corporations for purposes of avoiding a finding that Direct Media Power violated court orders with respect to post-judgment asset transfers. The evidence also shows that Tucci was aware of how a non-Illinois corporation could operate within the state by filing foreign corporation paperwork, and he testified that he had filed that paperwork in Illinois for the Delaware entity, which only further confirms that the two entities were separate. *See, e.g.*, (Dkt. 48) (Tr. Vol. 2) at 305:17–20 (Testimony of D. Tucci); PHX 47 (11/14/16 email from D. Tucci to D. Keller) (concerning a contemplated New Mexico entity,

stating "I do need to be able to operate in the State of Illinois, so you may have to file foreign state corp paperwork.").

Assessing the evidence as a whole, the Court concludes that the entity sued and against which Urban One obtained a default judgment is the Illinois entity. For example, in applying for credit with Urban One in June 2013, Tucci listed only the EIN 38-3907150 and authorized Urban One to contact certain banks in connection with DMP's credit application using this specific information. (Dkt. 34-7). In addition, Tucci confirmed that only one entity was involved in the bankruptcy proceedings—the Illinois entity. *Id.* at 8:20–9:2. The bankruptcy filings similarly reflect this fact. *See In re Direct Media Power, Inc.*, No. 16-36934 (Dkt. 1) (Bankr. N.D. Ill.) (listing the associated federal EIN as 38-3907150); *see also In re Direct Media Power, Inc.*, 582 B.R. at 742 ("The debtor in this bankruptcy case, DMP, is wholly-owned by DMP Holdings, Inc. [], also an Illinois corporation."); *see also* (Dkt. 41-5) at 10 (11/18/16 email from D. Tucci to A. Tracy) ("[W]e are going to put Direct Media Power, Inc. – an Illinois Corporation – Tax ID 38-3907150 – into Chapter 11 Bankruptcy reorganization effective immediately."). And statements from both Tucci and his counsel were that DMP's bankruptcy was attributable to Urban One, again indicate that, since only the Illinois entity filed for bankruptcy, Urban One was only involved with the Illinois entity. *See, e.g.*, (Dkt. 24) at 15 ("There is no injustice here, merely insolvency, largely due to Urban One's own overly aggressive litigation practice in bankruptcy and here, which choked the life out of Direct Media."); (Dkt. 55) at ¶ 38 ("Direct Media was an operating entity at the time it filed for Chapter 11 bankruptcy but was forced into Chapter 7 by Urban One"), ¶ 201 ("Urban One pushed Direct Media into Chapter 7 bankruptcy, and ultimately forced the complete insolvency of the company.").

Finally, documents that DMP submitted to this Court and other federal courts further confirm that only the Illinois corporation is separate. In the associated breach-of-contract action, No. 16 C 1867, DMP admitted that it was a "corporation organized and existing under the laws of the State of Illinois, with its principal place of business in Wood Dale, Illinois. . . . [DMP] is a citizen of Illinois." *See* (Dkt. 8) at ¶ 3. Also in that case as recently as November 2017, DMP itself represented that as of February 2, 2016, Tucci owned four separate entities (DMP, Teldebt Solutions, Dang, and FDATR) and that the DMP entity was incorporated in Illinois on May 21, 2013 and involuntarily dissolved on October 13, 2017. *See Radio One, Inc. v. Direct Media Power, Inc.*, No. 16 C 1867 (Dkt. 83) (Defendant's Opposition to Radio One's Motion for Fraudulent Transfer and Turnover of Certain Assets) (N.D. Ill. Nov. 16, 2017); *id.* (Dkt. 84) (Declaration of John H. Ray, III); *see also* (Dkt. 24) at 3 n.3 ("According to the Illinois Secretary of State, Direct Media was incorporated in Illinois on May 21, 2013, and involuntarily dissolved on October 13, 2017"; no mention of the Delaware entity).

In the Southern District of New York, in *Westwood One, Inc. v. Direct Media Power, Inc.*, where Westwood One brought a breach of contract claim against DMP for the alleged failure of DMP to pay for certain media advertising time, DMP removed the case to federal court on the basis of diversity jurisdiction. *See Westwood One, Inc. v. Direct Media Power, Inc.*, No. 16 C 1382 (Dkt. 1) (S.D.N.Y.). Specifically, DMP alleged "Plaintiff, Westwood One, Inc. is a Delaware corporation with its principal place of business located [in New York] . . . . Defendant DMP is an Illinois corporation and maintains its principal place of business in Wood Dale, Illinois. Accordingly, DMP is a citizen of Illinois for diversity purposes. Thus, Plaintiff and Defendant are citizens of different states." *Id.* at ¶¶ 4–6.

Although Tucci argues that "admissions cannot create diversity," citing to *Vasquez v. Visions, Inc.*, 2002 WL 91905 (N.D. Ill. Jan. 24, 2002), the relevant quotation from *Vasquez* is the following: "no action of a party can confer subject matter jurisdiction upon a federal court; parties can neither consent to nor waive subject matter jurisdiction." *Id.* at *5. But the admissions listed above do not constitute consent to or waiver of subject matter jurisdiction in a case where it otherwise does not exist. Instead, they constitute admissions against interest—most significantly the admission by Direct Media Power in *Westwood One, Inc.* that it is an Illinois company diverse from a Delaware company with its principal place of business in New York—that carry evidentiary weight. *See Molinos Valle Del Cibao*, 633 F.3d at 1342 (permitting admissions concerning domicile that were not self-serving, but instead worked against interest); *see also* Fed. R. Evid. 801(d)(2)(A). Again, Direct Media Power should not be permitted to selectively argue that it is a single company with both Delaware and Illinois incorporations to manipulate federal diversity jurisdiction to its benefit. In total, the requirements of diversity jurisdiction are satisfied, and Tucci's Rule 12(h)(3) Motion to Dismiss (Dkt. 31) is denied.

That being said, the Court still considers evidence of what may have been the Delaware entity's finances in its analysis of whether Tucci commingled funds among his various entities. In other words, all of Tucci's corporate intermingling are relevant to the veil-piercing analysis, whether or not they pertain to the indicted company.

## II. Tucci's Motion to Strike (Dkt. 22)

Tucci has raised another preliminary issue, calling into question the Court's authority to grant injunctive relief. *See* (Dkt. 22). In particular, Tucci argues that *Grupo Mexicano de Desarollo v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999) precludes the entry of an order seizing, freezing or restraining the use of Tucci's property prior to judgment.

In *Grupo*, Grupo Mexiano de Desarrollo ("GMD")—a Mexican holding company—issued $250 million in notes that were guaranteed by four of its subsidiaries. 527 U.S. at 310. The investment fund plaintiffs had purchased some $75 million of the notes. *Id*. A few years later, GMD was in financial trouble and unsuccessfully attempted to restructure its debt. In light of these circumstances, the plaintiffs accelerated payment of the notes and filed suit for the amount due under a breach-of-contract theory. *Id*. Plaintiffs alleged that GMD was either already insolvent or at risk of insolvency, was dissipating its most significant asset, and was preferring its Mexican creditors. *Id*. at 312. On this basis, district court issued a preliminary injunction restraining GMD from "dissipating, disbursing, transferring, conveying, encumbering or otherwise distributing or affecting" its assets. *Id*. at 310–14. The Supreme Court reversed, finding that the district court did not have the power to issue a preliminary injunction preventing a defendant from transferring assets pending adjudication of a contract claim for money damages. *Id*. at 333. The Court adhered to the long-established rule that "a judgment establishing the debt was necessary before a court of equity would interfere with the debtor's use of his property." *Id*. at 321.

Tucci argues that this case falls squarely under *Grupo* because Urban One ultimately seeks legal damages stemming from its breach-of-contract claim. But this case differs from *Grupo* in a few significant ways. First, Urban One already has a judgment against Direct Media Power, and in the supplementary proceedings in the breach-of-contract action, Urban One issued a citation to discover assets to Direct Media Power, which gave it a lien on its assets. *See* (Dkt. 1-3); *e.g.*, *Dexia Credit Local v. Rogan*, 2008 WL 4543013, at *11 n.2 (N.D. Ill. Oct. 9, 2008) (*Grupo* had no bearing on preliminary-injunction analysis in case based on alter-ego and fraudulent-transfer theories were judgment had already been entered, citation to discover had been issued, and plaintiff had established a reasonable likelihood of success on the merits of its claim that certain trusts held

assets of the judgment debtor) .  Furthermore, as explained below, Urban One has established a reasonable likelihood of success on its claim to pierce the corporate veils of Direct Media Power and DMP Holdings.  For these reasons, Urban One is not in the same posture as the investment-fund plaintiffs in *Grupo*, who were unsecured creditors awaiting judgment on their claims.  Instead, Urban One has obtained a judgment and secured its interest on that judgment pursuant to Illinois law.

Second, "the [*Grupo*] court specifically noted that a restraint on assets was still proper if a suit sought equitable relief."  *CSC Holdings, Inc. v. Redisi*, 309 F.3d 988, 996 (7th Cir. 2002).  Veil piercing "is an equitable remedy available when respecting the corporate form 'would promote injustice or inequity' by allowing a targeted corporation to escape liability for wrongdoing."  *Golin*, 704 F. App'x at 594 (quoting *Int'l Fin. Servs. Corp. v. Chromas Techs. Canada, Inc.*, 356 F.3d 731, 737 (7th Cir. 2004)).  For this reason, too, *Grupo* does not prevent the Court from issuing a preliminary injunction in this matter.

This case also is not similar to *Oak Leaf Outdoors, Inc. v. Double Dragon Int'l, Inc.*, 812 F. Supp. 2d 944 (C.D. Ill. 2011) (cited in (Dkt. 22) at 2).  That was an Illinois Uniform Commercial Code breach of contract case wherein the defendant sought a preliminary injunction on the basis of its counterclaims, some of which were equitable: promissory estoppel, unjust enrichment, and for certain injunctive relief.  Still, the court held that because all of the equitable counterclaims arose from the same occurrence—the breach of contract—*Grupo* prevented it from issuing preliminary injunctive relief prior to the adjudication of the breach of contract claim for money damages.  *Id*. at 947–48.  Even though Tucci is correct that the veil-piercing claim is connected to the breach-of-contract claim in the related case, different from *Oak Leaf Outdoors*, the breach-of-contract claim has already been adjudicated to judgment.  Therefore,  *Grupo* does not prevent the

Court from issuing a preliminary injunction in this matter and denies Tucci's request to strike Urban One's motion for preliminary injunction. (Dkt. 22). Further, to the extent that Tucci requests that the Court vacate the agreed TRO and terminate the preliminary injunction hearing, such requests are denied as moot.

**III.    Urban One's Motion for Preliminary Injunction**

**A.    Legal Standard**

The Seventh Circuit uses a two-step analysis to assess whether preliminary injunctive relief is warranted. *See Girl Scouts of Manitou Council, Inc. v. Girl Scouts of USA, Inc.*, 549 F.3d 1079, 1085–86 (7th Cir. 2008). "In the first phase, the party seeking a preliminary injunction must make a threshold showing that: (1) absent preliminary injunctive relief, [it] will suffer irreparable harm in the interim prior to a final resolution; (2) there is no adequate remedy at law; and (3) [it] has a reasonable likelihood of success on the merits." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 661–62 (7th Cir. 2015). If the movement makes the required threshold showing, then the court moves on to the second stage and considers: "(4) the irreparable harm the moving party will endure if the preliminary injunction is wrongfully denied versus the irreparable harm to the nonmoving party if it is wrongfully granted; and (5) the effects, if any, that the grant or denial of the preliminary injunction would have on nonparties," that is, the public interest. *Id.* at 662. The Court balances the potential harms on a sliding scale against the movant's likelihood of success. The greater the movant's likelihood of success, "the less strong a showing" the movant "must make that the balance of harm is in its favor." *Foodcomm Int'l v. Barry*, 328 F.3d 300, 303 (7th Cir. 2003).

The grant of a preliminary injunction is not a *per se* decision on the merits, it is "merely a decision that the suit has enough merit—which need not be great merit—to justify an order that will freeze the situation . . . for such time as it may take to determine whether the suit is, or is not

meritorious." *Ayres v. City of Chicago*, 125 F.3d 1010, 1013 (7th Cir. 1997). Establishing a likelihood of success on the merits requires a movant to show a "greater than negligible chance of winning." *AM Gen. Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 804 (7th Cir. 2007).

**B.    Analysis**

For the reasons set forth in this section, the Court concludes that the requirements for entry of a preliminary injunction have been satisfied.

**1.    Reasonable Likelihood of Success on the Merits**

Under a preliminary-injunction analysis, the Court first considers whether Urban One is likely to succeed on the merits of its Complaint, which again brings claims for veil piercing and fraud. *See* (Dkt. 1). This means that Urban One must show that "it has a better than negligible chance of succeeding on the merits so that injunctive relief would be justified." *Personeta, Inc. v. Persona Software, Inc.*, 418 F. Supp. 2d 1013, 1016 (N.D. Ill. 2005) (quoting *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 897 (7th Cir. 2001)).

Looking at Urban One's veil piercing claim, in diversity cases, the Court looks to the substantive law of the state in which the district court sits, here Illinois. *Wachovia Sec., LLC*, 674 F.3d at 751. Under Illinois law, efforts to pierce the corporate veil are "governed by the state of incorporation," which, for the reasons discussed above, is Illinois. *Stromburg Metal Works, Inc. v. Press Mechanical, Inc.*, 77 F.3d 928, 933 (7th Cir. 1996). Corporations exist separately from their shareholders, officers, directors, and related corporations, and those individuals and entities ordinarily are not subject to corporate liabilities. *Laborers' Pension Fund v. Lay–Com, Inc.*, 580 F.3d 602, 610 (7th Cir. 2009) (citation omitted). "Yet courts may pierce a corporation's veil and hold the individual investors personally liable for the underlying claim if the corporate form is used as a cloak or cover for fraud or illegality, to work an injustice, to defend crime, or to defeat

an overriding public policy, or where necessary to achieve equity." *Wachovia Sec., LLC*, 674 F.3d at 751 (citation and quotation omitted). Illinois law permits piercing when: (1) there is such a unity of interest and ownership that the separate personalities of the corporation and the individual no longer exists; and (2) "circumstances must be such that adherence to the fiction of separate corporate existence which sanction a fraud or promote injustice." *Id.* at 751–52.

On the first prong (unity of interest) Illinois courts consider the following factors: inadequate capitalization; failing to issue stock; failing to observe corporate formalities; failing to pay dividends; corporate insolvency; nonfunctioning corporate officers; missing corporate records; commingling funds; diverting assets to an owner or other entity to creditor detriment; failing to maintain an arm's-length relationship among related entities; and whether the corporation is a mere façade for a dominant owner. *Id.* at 752. No single factor is determinative, with the circumstances of each case driving the inquiry. *Id.*

### i.     Tucci's Credibility

The foundation of Tucci's defense that Urban One has not shown a likelihood of success on the merits on its claim to pierce the veils of DMP Holdings and Direct Media Power is his own testimony that both entities maintained "substantial" corporate records, official structure, and separate existences. *See, e.g.*, (Dkt. 25) (Tucci Decl.) at ¶¶ 4–8; (Dkt. 49) (Tr. Vol. 3) at 324:7–18, 325:19–23, 327:4–5, 327:12–14, 332:14–333:11. Although called to the stand three times during the hearing, giving him numerous opportunities to correct potentially mistaken testimony, Tucci remained a noncredible witness. He frequently changed his statements and was impeached repeatedly. For example, in a declaration submitted prior to the hearing, Tucci attested that Keller never provided him with the Radio One citation on November 11, 2016 and he had no knowledge of "any such citation until after the conclusion of any transfers at issue." He "only learned of the

citation through a letter from U.S. Bank after the conclusion of any transfers."  (Dkt. 25) (Tucci

Decl.) at ¶ 11 (signed under the penalty of perjury); *see also* (Dkt. 55) at ¶ 210.

Conversely, at the hearing, Keller testified that Tucci was at the office all day, she gave the

citation to him, and they had a conversation about how to make payroll.  *See* (Dkt. 47) (Tr. Vol.

1) at 41:10–42:19.  Tucci then testified that he was not in the office during the day on November

11 because he was with his ailing mother (specifically, "at my mother's bedside"), who passed

away that evening.  (Dkt. 49) (Tr. Vol. 3) at 343:20–344:4.  Instead, Tucci testified he first arrived

at the office around 5:45 p.m.; time clock records reflect that he had swiped his finger on the

biometric time clock at 5:36 p.m.  *Id.* at 345:16–21, 349:12–15; DHX 17 at 1 (FDATR timecards

for Tucci 11/7/16 to 11/13/16).

Although Tucci's testimony was that he first arrived for the day at 5:36 p.m., Urban One

introduced other evidence that Tucci was at his desk taking calls from approximately 8:00 a.m.

until at least 2:20 p.m. on November 11.  *See* PHX 59A–I (telephone call recordings).  In light of

this evidence, Tucci's then testified that he could have been in the office in the morning, left, and

then returned at 5:36 p.m., but that he could not recall for sure.  (Dkt. 49) (Tr. Vol. 3) at 376:6–

377:11.  Of course, Tucci's position on this point might seem minor, but it is critical to his

awareness of the citation.

Tucci's attestation that he did not learn of the citation until he was later notified by U.S.

Bank (presumably sometime around November 17) was also called into question by both hearing

exhibits and his own testimony.  *See* (Dkt. 25) (Tucci Decl.) at ¶ 11 ("I only learned of the citation

through a letter from U.S. Bank after the conclusion of any transfers."); *see also* PHX 4E (DMP

U.S. Bank 8690 out report) (noting "IL Citation/Radio One" as a $607.73 debit on 11/17/16).

Urban One introduced the following evidence:  (1) a text message from Tucci to Keller at 8:25

p.m. on November 11 stating "I don't need [Urban One's counsel] trying to fuck with us we should move the bank accounts on Monday," PHX 45 at 6; and (2) a November 15, 2016 email from Tucci to Keller instructing her to "Send the latest Citation paperwork that is being sent to USBank" to his attorney, collect documents needed to open new bank accounts at Citibank, and to switch the tax IDs on certain of Direct Media Power's accounts and add "doing business as" designations to Dang accounts, PHX 48. Keller testified that these actions were directed so that Tucci could continue operating his companies as normal. *See* (Dkt. 47) (Tr. Vol. 1) at 54:17–57:11.

Tucci stated in his declaration that he was unaware of any citation when he made substantial funds transfers out of Direct Media Power's accounts after November 11, 2016. Yet under oath at the hearing, Tucci first, invoked his Fifth Amendment right against self-incrimination when questioned about transfers made out of Direct Media Power's U.S. Bank accounts after the citation was served.. *See* (Dkt. 47) (Tr. Vol. 1) at 172:10–175:7; *see Evans v. City of Chicago*, 513 F.3d 735, 741 (7th Cir. 2008) (negative inference against a witness who invokes the Fifth Amendment in a civil case is permissive, not required). Tucci later waived the Fifth Amendment rights of Direct Media Power as well as its attorney-client privilege with its former attorney Adam Tracy (*see* (Dkt. 49) (Tr. Vol. 3) at 340:20-341:1) and admitted that although he had not "receive[d] a copy of the citation," he had email communications with Tracy *regarding the citation* on November 14 and 15 and that he acted on Tracy's advice with regard to actions taken concerning Direct Media Power's U.S. Bank accounts. *Id*. at 349:18–22, 351:18–352:6, 353:10–15. According to the out report for Direct Media Power U.S. Bank 8690, transfers from November 11 to November 17, 2016 included various items totaling $139,000 to Dang; $45,000 to Direct Media Power BOA 6530; $5,000 to Direct Media Power BOA 6543; $1,000 to Tucci's U.S. Bank 9216; and $500 to Tucci's U.S. Bank 7601. *See* PHX 4E. In addition, from

the date of the citation to February 22, 2017, substantial transfers were made out of Direct Media Power BOA 6530 to TelDebt BOA 6556. *See* PHX 6E (TelDebt BOA 6556 in report for 1/5/16 to 2/22/17). Regarding these transfers, Tucci affirmed his prior testimony that they were done to "protect the money to pay whatever debts he wanted to pay by putting the money in another entity's account and paying [Direct Media Power] debts out of that account." (Dkt. 47) (Tr. Vol. 1) at 152:17–153:6. As a result of this evidence and Tucci's constantly changing testimony, Tucci is not a credible witness. Aside from the inconsistencies that arose from his prior statements and in-court hearing testimony, Tucci also was repeatedly impeached with prior deposition testimony. *See, e.g.*, (Dkt. 47) (Tr. Vol I) at 130:12–132:14 (prior testimony on two occasions that Tucci had not received any income beyond his salary from Direct Media Power was untrue, as Tucci admitted that he received payments, transfers, or funds from Direct Media Power); *id*. at 149:4–150:11 (when he testified that FDATR could not have used intercompany transfers for any purpose, Tucci was impeached with prior deposition testimony where he agreed that "TelDebt or FDATR could have used that money for whatever purpose"). One particularly stunning example occurred when Tucci was asked about the intercompany transfers:

> Q. I asked: "Do you transfer money every month to TelDebt Solutions?" Isn't that correct?
>
> A. Yes.
>
> Q. And you said: "There has been commingling of funds, yes." That was your answer, isn't it?
>
> A. That's what I said in the deposition.
>
> Q. And were you being truthful there?
>
> A. I don't—I don't believe I was using the word appropriately.
>
> Q. You were using "commingling" in the other definition of "commingling."
>
> A. What would that be?
>
> Q. There's only one definition of "commingling," isn't there?
>
> A. I don't know.

| Q. | "Commingling" means mixing together, right?  That's your understanding of "commingling." |
|----|-----------------------------------------------------------------------------------------|
| A. | Is that your definition of "commingling"? |
| Q. | I'm asking you whether that's your understanding of "commingling." |
| A. | I don't know if that is the answer of "commingling." |
| Q. | Are you aware of a definition of "commingling" other than mixing together? |
| A. | I'm not certain. |
| Q | So you used the term "commingling" without knowing what it means? |
| A. | I believe so. |

(Dkt. 47) (Tr. Vol. 1) at 154:1–155:1.  Based on the above discussion and an overall review of the record, the Court finds that Tucci generally was not a credible witness, and thus, where his testimony stands without corroboration in the below analysis, the Court gives it little weight.

### ii.　Direct Media Power

The Court starts its analysis with Direct Media Power.  Altogether, Urban One has submitted sufficient evidence to show that it is reasonably likely that neither Direct Media Power nor DMP Holdings had an existence that was separate and independent from Tucci.

### a.  Inadequate capitalization and insolvency.

Urban One has presented sufficient evidence to demonstrate that it can show that Direct Media Power was undercapitalized and is insolvent.  A court will find a corporation to be undercapitalized only when it "has so little money that it could not and did not actually operate its nominal business as its own." *Judson Atkinson Candies, Inc. v. Latini–Hohberger Dhimantec*, 529 F.3d 371, 379 (7th Cir. 2008) (citation omitted).  "[U]ndercapitalization is the single most important factor in the veil-piercing analysis." *Laborers' Pension Fund*, 580 F.3d at 612.  As to capitalization, the evidence here indicates only that Tucci, as the sole owner of this company, contributed $150,000 in 2015 and personally guaranteed a $1 million or more loan at some point. (Dkt. 49) (Tr. Vol. 3) at 326:1–13.  Even without exact evidence as to what Direct Media Power's

prospective liabilities were so as to compare whether it had enough capital to meet those liabilities,[4] the evidence of frequent "intercompany transfers" from TelDebt, FDATR, and Dang so that Direct Media Power could pay its bills and payroll (in other words, Direct Media Power's demonstrated *failure* to meet its debts) is sufficient to demonstrate that Direct Media Power was undercapitalized in at least 2016 and 2017. *See also Radio One v. Direct Media Power, Inc.*, No. 16 C 1867 (Dkt. 85) (N.D. Ill. Nov. 16, 2017) (Direct Media Power's Opposition to Motion for Civil and Criminal Contempt) ("Direct Media had previously avoided bankruptcy only by substantial funds from FDATR, TelDebt, and Tucci."). Not only that, there is no dispute that Direct Media Power was and is insolvent, as it filed for bankruptcy in November 2016, and that it ceased operations in May 2017 and was involuntarily dissolved in October 2017.

### b. Failure to issue stock or pay dividends.

As for stock, Tucci testified that Direct Media Power stock was issued, but no evidence was offered to support this assertion, such as the actual stock certificates or documents reflecting their transfer to DMP Holdings. As the majority owner of DMP Holdings, any such documentation should be in Tucci's control, and his failure to produce them calls their existence into question. *See, e.g.*, *Dimmitt & Owens Fin., Inc. v. Superior Sports Prod., Inc*., 196 F. Supp. 2d 731, 738 (N.D. Ill. 2002). As for dividends, Tucci testified that no dividends were ever issued by Direct Media Power. (Dkt. 49) (Tr. Vol. 3) at 361:5–7.

### c. Failure to observe corporate formalities and missing corporate records.

The testimony and evidence submitted at the preliminary injunction hearing reflected that Direct Media Power was a real business that operated with a decent number of employees,

---

[4] Notably, in the *Radio One* Litigation Direct Media Power claims that as the date of the default judgment, it had $3,483,430.04 in liabilities (including the default judgment) and only $102,268.94 in assets. *See Radio One v. Direct Media Power, Inc.*, No. 16 C 1867 (Dkt. 83) (N.D. Ill. Nov. 16, 2017) (Direct Media Power's Opposition to Motion for Fraudulent Transfer).

somewhere between 15 and 35 depending on the year. However, despite Tucci's argument that Direct Media Power employees "served as checks and controls to execute the daily operations of the company" in its best interest (*see* (Dkt. 24) at 13), the evidence and testimony presented at the hearing unequivocally demonstrated that he maintained complete control over Direct Media Power's finances and operations.

Looking first at formalities, Tucci testified that the Direct Media Power board of directors (just him) never convened a meeting and he could not say whether the company ever acted upon consent in lieu of a meeting. Further, Urban One elicited testimony that Direct Media Power failed to file federal income tax returns outside of an IRS audit. As for records, Tucci argues that Direct Media Power has "substantial corporate records" including formation documents, bank records, unspecified tax documents, financial statements, and accounting records such as QuickBooks files and Excel records. (Dkt. 24) at 13; *see also* (Dkt. 25) (Tucci Decl.) at ¶ 8. But there is a conspicuous absence of corporate records in this case: the only records presented at the hearing were the in/out reports and bank statements, and Tucci testified this was the universe of Direct Media Power's financial records. This means that the in/out reports were the only internal financial records for the company. He further confirmed that despite the numerous "intercompany transfers" to/from Direct Media Power, the company did not have documentation to support the transfers. As for amounts that he received from Direct Media Power, no employment agreement was presented and Tucci testified that there was no agreement regarding his entitlement to commissions. As to the other corporate records, although Tucci testified that they were in existence; yet no documents were offered. No evidence of corporate formalities being observed was presented at hearing. Instead, Tucci an Direct Media Power's affairs as he pleased, without accountability or input from others.

### d. Non-functioning of corporate officers.

Tucci served as the President and CEO of Direct Media Power, its single director, and its sole owner until February 2016 at which time he became a 90% owner of the company. In addition, Tucci himself controlled Direct Media Power's finances, as he was the only individual with authority to sign checks and direct wire transfers. To the extent that DeFranzo was a corporate officer of Direct Media Power, either the chief marketing officer of the chief operations officer, Tucci's control over the company rendered DeFranzo non-functioning. In fact, the only evidence of actions taken by DeFranzo is his execution of the Confidential Credit Application with Radio One in June 2013, although Tucci's signature also was required on the Application to authorize Direct Media Power's bank and credit reference checks. *See* PHX 50.

### e. Commingling funds, failure to maintain arm's length relationships among entities, and diversion of assets to an owner or other entity to creditor detriment.

Urban One presented evidence that Tucci both commingled his own funds with those of Direct Media Power and also that the funds of Direct Media Power were commingled with Dang, TelDebt, and FDATR. Specifically, the testimony and documents presented reflect that Tucci regularly received direct transfers from Direct Media Power and the other entities without justification, particularly for those transfers that occurred well above and beyond his salary from Direct Media Power and those that occurred after he transferred his ownership of Direct Media Power, TelDebt, and FDATR to DMP Holdings in February 2016. Instead, they were noted indiscriminately and incorrectly as "intercompany transfers." On this point, Keller testified, "[t]here was [sic] essentially checks that were cut directly to Dean Tucci from all entities on a need to—a need—a need-to-need basis, whenever he needed something." (Dkt. 47) (Tr. Vol. 1) at 32:2–6.

As to this factor, Tucci points to the fact that he did not maintain a joint account with Direct Media Power, but this immaterial in relation to the voluminous evidence that he directed transfers from Direct Media Power without any legitimate business purpose. In other words, although he technically did not share a bank account with Direct Media Power, he exercised complete dominion and control of the Direct Media Power accounts such that he used them as his own, directing "intercompany transfers" to be made to his own accounts and those of Piliciauskiene, his children, and his ex-wife. Tucci also directed the payment of a salary to Piliciauskiene even though she was not an employee. As further evidence of the lack of separation between Tucci's finances and those of Direct Media Power, Direct Media Power employees maintained in/out reports for Tucci's *personal* accounts alongside the same type of reports for the entities. *See* PHXs 4B, 4C, 4L.

Not only that, in/out reports and bank statements for the various entities, as well as Tucci's testimony on this topic, constitute sufficient evidence to demonstrate the commingling of entity funds and his failure to maintain arm's-length relationships between them. In fact, the evidence indicates that Tucci did not respect the distinction between the funds of the separate companies and instead considered the money to be interchangeable with daily cash flow needs. As Keller testified, "[e]ssentially money would move, depending on whichever business was bringing in more cash flow that day." (Dkt. 47) (Tr. Vol. 1) at 31:13–22. Money from the other entities was transferred into Direct Media Power so that it could pay its bills. (Dkt. 49) (Tr. Vol. 3) at 339:22–25. At other times, money went from Direct Media Power to the entities so that for some reason they could and pay Direct Media Power's bills. *See* (Dkt. 24) at 7 n.10 ("Because all of the related entities shared a common ownership, and related entities provided funding and payroll and media expense payment services to Direct Media, some Direct Media expenses were paid by related

entities, which otherwise could have been included in Direct Media's budget and cash collateral orders."). And although he later walked back his testimony, Tucci originally testified that there was indeed a "commingling of funds."

To rebut this evidence, Tucci makes much of the fact that the intercompany transfers were "meticulously recorded" in the in/out reports. (Dkt. 55) at ¶¶ 249, 252. However, that documentation alone cannot overcome Urban One's showing on this factor. That is, the recordings cannot compensate for the lack of business purpose or formality inherent in the transactions that Tucci directed, particularly in the absence of any testimony or other evidence concerning any actions taken on account of the notations. The same goes for Tucci's argument that the maintenance of separate bank accounts for each entity proves that no funds were commingled. (Dkt. 55) at ¶ 249. Although separate accounts were established, the evidence in the record unambiguously shows that funds were transferred routinely between and among entities at Tucci's direction as needed. In addition, contrary to Tucci's argument that certain entities worked for or provided services to Direct Media Power, (Dkt. 24) at 12, no evidence of any such arrangements or agreements was presented at the hearing. And in fact, Tucci himself testified that no documentation supported the intercompany transfers.

Further, Urban One has presented adequate evidence to show that the timing and manner of many of the transfers indicates that they were manipulated and conducted to prevent Urban One from collecting its judgment and to prevent Direct Media Power from having to cease operations despite the judgment and supplemental proceedings. *See* PHX 4F (DMP in report for BOA 6530 for 1/4/16 to 12/30/17) (reflecting mostly intercompany deposits from DMP U.S. Bank 8690 until 11/15/16 when media deposits started coming in to this account along with additional intercompany transfers from FDATR and TelDebt); PHX 4K (Dang U.S. Bank 9319 out report for

10/31/16 to 2/14/17) (on 11/1/16, beginning to issue checks for media purchases); PHX 4J (Dang U.S. Bank 9319 in report for 10/28/16 to 2/17/17) (reflecting $612,170.33 in deposits during this period, all of which came from intercompany transfers with the exception of one unaccounted for deposit of $400 and $0.33 from Paycycle). Tucci's testimony (specifically that detailed in Section 3(b)(1)(i) *supra*) further demonstrated that his motive in transferring funds was to protect his money and avoid the citation proceedings. As a final point on this factor, the timing of Tucci's creation of DMP Holdings—20 days or so after being sued by Urban One—and transferring his entities to DMP Holdings also goes to show Tucci's efforts towards asset diversion.

### f. Whether the corporation is a mere façade for the dominant owner.

Tucci maintained complete control over all aspects of Direct Media Power, both before and after he transferred ownership to DMP Holdings. *In re Direct Media Power, Inc.*, 582 B.R. at 753–54 ("He kept the books and controlled the accounts. He exerted control over DMP's daily operations and authorized every transaction."). In light of the evidence described above—Direct Media Power's undercapitalization and its insolvency; its lack of vital corporate records or functioning corporate officers; Tucci's complete control of not only Direct Media Power, but also DMP Holdings, TelDebt, FDATR, and Dang; his indiscriminate use of the companies' funds to pay each other's obligations as they arose or to pay himself and his family members; his failure to maintain records for Direct Media Power outside of the in/out reports or abide by corporate formalities; his transfer of funds out of Direct Media Power accounts in order to avoid paying Urban One's default judgment; and Direct Media Power's resultant insolvency—Urban One has demonstrated a reasonable likelihood of success on the first prong of the veil-piercing analysis.

### iii.        DMP Holdings

Overall with regard to DMP Holdings, Tucci argues that a "corporate restructuring is not evidence of a fraud." (Dkt. 24) at 12. True enough, but the evidence (or lack of evidence) supporting the restructuring or DMP Holdings' business activities in the record, combined with the timing of the restructuring, raises serious questions as to whether DMP Holdings was set up for the sole purpose of providing a liability shield for Tucci after the *Radio One* Litigation was filed.

### a. Non-functioning of corporate officers.

Here again, the evidence shows that DMP Holdings was managed and controlled solely by Tucci, without any input from Piliciauskiene, the minority shareholder. Further, the hearing testimony suggested that the DMP Holdings board of directors of was composed of either just Tucci and Keller or Tucci, Keller, Piliciauskiene, and Tucci's children. Either way, no evidence was offered as to Piliciauskiene's or the children's involvement in the company, and Keller and Tucci both testified that no board meetings were held. *Id*. at 26:15–21, 176:2–9. In fact, Tucci testified that the board "never did anything formal" after the company was formed. (Dkt. 49) (Tr. Vol. 3) at 327:17–19. On this record, Urban One has demonstrated that any officers of DMP Holdings aside from Tucci likely would be considered non-functioning.

### b. Failure to issue stock or pay dividends.

Although Tucci testified that DMP Holdings issued stock, no further corroborating evidence of a stock issuance was offered even though such evidence is undoubtedly in Tucci's control as DMP Holding's majority owner. As to dividends, Tucci testified that he had never paid a formal dividend out of this company. (Dkt. 47) (Tr. Vol. 1) at 176:2–9.

### c. Inadequate capitalization and insolvency.

Urban One presented evidence that DMP Holdings did not have a bank account until approximately one year after its formation, and even then it had a zero balance. Although Tucci contributed corporate assets to DMP Holdings, the minority shareholder did not contribute anything of value for her 10% interest. In addition, hearing testimony reflected that no dividends were paid from Direct Media Power to DMP Holdings and distributions that were made to Tucci from the entities that constituted DMP Holdings' assets completely bypassed DMP Holdings and went directly to Tucci's accounts. Based on this evidence, there is no question that DMP Holdings lacked adequate capital of its own. Nor was any evidence presented as to DMP's stock holdings either at formation or at present. Without adequate capitalization, "a corporation becomes a mere liability shield, rather than an independent entity capable of carrying on its own business." *Wachovia Sec., LLC*, 674 F.3d at 752 (quoting *Fiumetto v. Garrett Enters., Inc.*, 321 Ill. App. 3d 946, 959 (2d Dist. 2001)).

Further, although Tucci testified that DMP Holdings is solvent, he did not support this statement with further detail or evidence. And in fact, Tucci admitted that one of DMP Holdings' assets—Direct Media Power—is insolvent and dissolved, and he also testified that the ownership of another asset—FDATR—had changed hands in 2017. No evidence was submitted regarding the current state of any TelDebt entity. Altogether, Urban One has shown that it is reasonably likely that DMP Holdings is not solvent.

### d. Failure to observe corporate formalities and missing corporate records.

Even if it is simply a holding company, such a company would still be expected to have certain corporate records. In fact, Tucci claims that DMP Holdings has "substantial corporate records, including but not limited to its formation documents, bank records, taxes, financial statements, and accounting records." (Dkt. 24) at 11; *see also* (Dkt. 25) (Tucci Decl.) at ¶ 5 (same).

45

But not a single one of those "substantial corporate records" was submitted as evidence either in connection with the preliminary injunction briefing or at the hearing. The only evidence pertaining to the company was a publically accessible printout from the Illinois Secretary of State's website containing details about its formation. PHX 2. The absence of any records is even more troubling given Tucci's control over DMP Holdings' records as its majority owner and board member. For example, Tucci offered declaration testimony that DMP Holdings sold FDATR to Ken Halverson in July 2017. (Dkt. 25) (Tucci Decl.) at ¶ 3. Still, Tucci offered no supporting documents. Likewise, Tucci did not present any documents related to any of DMP Holdings' activities with respect to the asset companies. *See, e.g.*, *Dimmitt & Owens Fin., Inc.*, 196 F. Supp. 2d at 738 ("An unfavorable evidentiary presumption arises if a party, without reasonable excuse, fails to produce evidence which is under his control.").

The complete absence of corporate records also contributes to a finding that DMP Holdings failed to observe corporate formalities. Without documentary evidence that Tucci adhered to (or even created) by-laws for the company, filed income taxes, or maintained any financial records whatsoever, the Court is left only with (1) testimony that no board of directors meetings were ever convened for DMP Holdings and (2) testimony and other evidence that Tucci failed to observe formalities when it came to transferring money from DMP Holdings' assets—Direct Media Power, TelDebt, and FDATR—into his own account or between the accounts of the assets, as was already discussed at length above. Again, instead of receiving 90% of any distributions from DMP Holdings (with Piliciauskiene receiving the other 10%), Tucci simply authorized and accepted wire transfers directly from Direct Media Power, TelDebt, and FDATR into his personal accounts despite the ownership change of those entities on February 26, 2016 and without any corresponding documentation except for the incorrect notation in the in/out reports that the wires

46

were "intercompany transfers." Overall, the absence of proper corporate records related to capitalization, loans, distributions, and the transfers between related entities "paints a detailed picture of [Tucci] failing to respect the corporate form" and instead running DMP Holdings' affairs as he pleased, without accountability or input from others. *Wachovia Sec., LLC*, 674 F.3d at 754.

### e. Commingling of funds, failure to maintain arm's length relationships among entities, and diversion of assets to an owner or other entity to creditor detriment.

DMP Holdings did not have any funds of its own, but for the many reasons already discussed, Urban One has offered sufficient evidence of commingling and the lack of arm's-length relationships among the entities that were DMP Holdings' assets. In addition, hearing evidence demonstrated that funds of the asset companies were routinely transferred to and from Dang— which was not an asset company and which remained wholly owned by Tucci during this entire time. As with the transfers among the asset companies, the Dang transfers were done without any documentation beyond the in/out reports and without a legitimate business reason. Instead, Tucci directed the transfers to cover bills and debts of the asset entities and also to divert funds potentially subject to the default judgment.

### f. Whether the corporation is a mere façade for the dominant owner.

On this point, Urban One introduced enough evidence to show that it is more than likely that DMP Holdings was a sham corporation that was only organized to create an extra layer of liability protection for its majority owner, Tucci, after the start of the *Radio One* Litigation. For his part, Tucci has not offered any evidence or argument to indicate that DMP Holdings was a functioning corporate entity separate from himself. Similar to Direct Media Power, Urban One has demonstrated a reasonable likelihood of success on the first prong of the veil-piercing analysis with regard to DMP Holdings.

47

### iv. Adherence to the Fiction of the Separate Corporate Existences of DMP Holdings and/or DMP Would Sanction Fraud or Promote Injustice

In order to satisfy the second prong, Urban One must point to more than the mere prospect of an unsatisfied judgment and must show that "some 'wrong' beyond a creditor's inability to collect [will] result" if the veil is not pierced, such as the individuals being unjustly enriched or unfairly avoiding liability after draining corporate assets. *See Sea-Land Servs., Inc. v. Pepper Source*, 941 F.2d 519, 522–24 (7th Cir. 1991). Here, Urban One has presented sufficient evidence to demonstrate that allowing Tucci to hide behind either DMP Holdings or Direct Media Power would sanction a fraud and promote injustice on account of his efforts—taken in violation of court orders and valid liens—to keep Direct Media Power's assets out of reach and prevent Urban One from collecting on its judgment. In other words, Tucci used his web of corporations to ensure that Direct Media Power would not have sufficient funds to pay the judgment. Adhering to Direct Media Power's or DMP Holdings' corporate form therefore "would sanction an attempt by [Tucci] to set up a flimsy organization to escape personal liability." *Wachovia Sec., LLC*, 674 F.3d at 756. All in all, the Court concludes that Urban One has put forth more than enough evidence to show a reasonable likelihood of success on the merits of its veil-piercing claim. The evidence that Tucci offered to rebut this finding—largely in the form of his own testimony—is not sufficient to negate this conclusion.

### 2. Irreparable Harm and No Adequate Remedy at Law

To establish irreparable harm, a party must demonstrate "that irreparable injury is likely in the absence [or issuance] of an injunction," and a preliminary injunction should never be issued based upon a mere possibility of irreparable harm. *See Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Here, Urban One has a valid judgment against Direct Media Power, and, based on the above analysis, it has shown that it is reasonably likely that it will prevail on its claim to

48

pierce the corporate veils of Direct Media Power and DMP Holdings so as to allow it to collect its judgment from Tucci. Urban One also has established that it will suffer irreparable harm unless Tucci is prevented from transferring or disposing of assets sufficient to pay the default judgment. Specifically, the Court does not take lightly the evidence presented at the hearing and before the bankruptcy court of Tucci's active disregard for court orders and mismanagement and diversion of Direct Media Power's business operations and assets in an attempt to evade its creditors.

In this way, Urban One has shown that absent an injunction, Tucci will dispose of whatever assets he might have that would enable him to pay the judgment. A significant risk of transfer beyond the court's jurisdiction of the assets of a judgment debtor that might be used to satisfy the judgment against it (or him) qualifies as an irreparable injury. *See Dexia Credit Local v. Rogan*, 2008 WL 4855416, at *8 (N.D. Ill. Nov. 10, 2008). Once the assets are dissipated or removed from the jurisdiction of the Court, Urban One would lack any reasonably adequate means to levy on those assts. Tucci's history of concealing assets to avoid creditors discussed above demonstrates that this is a significant risk, despite Tucci's argument that ((Dkt. 24) at 13) there is "no evidence" that he does not intend to satisfy the judgment. *See, e.g.*, *In re Direct Media Power*, Inc., 582 B.R. at 754 (finding "clear and convincing evidence that Tucci and DMP knowingly violated orders of this court," namely the cash collateral orders); (Dkt. 48) (Tr. Vol. 2) at 213:14–18 (Testimony of B. Czahor) (testifying that Tucci told him "that he was going to look for an attorney to find—an attorney that can get him a trust where he can put his dividends into a trust and put it offshore because of everything that's going on"). This is sufficient to establish the lack of an adequate legal remedy. *See Dexia Credit Local*, 2008 WL 4855416, at *8. As a final point, Tucci's citation to *Monfardini v. Quinlan*, 2003 WL 21384642 (N.D. Ill. June 13, 2003) ((Dkt. 55) at ¶ 265) is distinguishable for numerous reasons, primarily because there, the court found "no

evidence that [the defendants] are dissipating or concealing the assets that [the plaintiff] is attempting to freeze . . .." 2003 WL 21384642, at *3. As already discussed, Urban One has produced ample evidence that Tucci was dissipating and concealing assets that could be used to pay the default judgment, and accordingly it has met its showing if irreparable harm. *See Dexia Credit Local v. Rogan*, 602 F.3d 879, 885 (7th Cir. 2010) (affirming injunction where district court relied on evidence that enjoined party took steps to evade creditors and conceal assets).

### 3. Balancing of Harms to the Parties

The Court must also weigh "the harm that the plaintiff will suffer absent an injunction against the harm to the defendant from an injunction and consider whether an injunction is in the public interest. *Planned Parenthood of Ind. and Kent., Inc. v. Comm'r of Ind. State Dept. of Health*, 2018 WL 3567829, at *4 (7th Cir. 2018). "[T]he more likely the plaintiff is to win, the less heavily the need the balance of harms weigh in his favor." *Id*. In applying the Seventh Circuit's standard, the Court relies less heavily on the balancing of the harms in the current matter given the of the Urban One's claim for veil piercing; still, the balancing of the harms further supports a preliminary injunction.

Tucci will undoubtedly experience harm from entry of a preliminary injunction. Specifically, he offered testimony that he "can't even live right now," he "can't even pay [his] health insurance" although he did not elaborate on what those costs are. (Dkt. 49) (Tr. Vol. 3) at 357:13–21. Tucci also argues that he will be harmed by having to defend meritless sanctions actions based on baseless charges by Urban One for violating any prospective injunction. (Dkt. 24) at 14–15. For one, any future litigation over a potential violation of the injunction is not concrete harm that can be considered at this stage. In addition, that alleged harm strikes the Court as potentially "self-inflicted" and therefore inappropriate for this inquiry. *See Stuller, Inc. v. Steak*

*N Shake Enters., Inc.*, 695 F.3d 676, 679 (7th Cir. 2012); *see also Second City Music, Inc. v. City of Chicago*, 333 F.3d 846, 850 (7th Cir. 2003) (case-by-case determination should be whether an injury is readily avoidable and truly self-inflicted if not avoided).

Finally, Tucci argues that Urban One has failed to produce evidence that he personally has sufficient assets or funds to pay the default judgment or that Urban One could take priority over Direct Media Power's other creditors if the corporate veils are pierced, meaning, in Tucci's interpretation, that Urban One has failed to show that an injunction will make any difference to its ability to collect its judgment. (Dkt. 24) at 14; *see also id.* at 15 (arguing that there is no evidence that an injunction would "preserve any assets to satisfy a judgment"). Maybe so, but this is not a "harm" to Tucci such that it could counterbalance the harm to Urban One in the absence of an injunction. It seems more appropriate to consider this argument in evaluating Urban One's chances of success on the merits, but even there, the collectability of any eventual judgment from Tucci does not make Urban One's claim more or less plausible.

Given Urban One's strong likelihood of success on the merits, the harm to Tucci does not outweigh the harm that would befall Urban One in the absence of injunctive relief. Moreover, it seems possible that Tucci's assets may still be frozen on account of the loan issue counsel mentioned late last year, which would mean that he would not suffer any additional harm on account of an injunction entered in this matter. As a final point, Urban One seeks expedited discovery and a speedy trial, which should work to minimize the inconvenience to Tucci during the period of the injunction. (Dkt. 8) at 14.

### 4. Effects on Non-Parties

As the last step of the preliminary-injunction analysis, the Court must balance the irreparable harms with the public interest, including the impact of granting or denying a

preliminary injunction on nonparties to the litigation. *Girl Scouts of Manitou Council, Inc.*, 549 F.3d at 1100. Despite Tucci's argument that this is a private dispute with no reach beyond the parties to this action and no meaningful public interest (*see* (Dkt. 24) at 15; (Dkt. 55) at ¶ 271), the Court holds that an injunction in this matter will promote justice. Court orders must be preserved and upheld, and it is in the interest of public policy to demonstrate that abuse of Court's orders is improper.

## IV.      Filing Certain Exhibits Under Seal (Dkts. 51, 56)

Finally, in connection with its proposed findings of fact and conclusions of law, Urban One submitted exhibits from the preliminary injunction hearing, some of which were personal banking documents. The parties now ask the Court to determine whether the following exhibits should be filed under seal:

- PHXs 4A through 4L (in/out reports for Direct Media Power and Dang);
- PHXs 6A through 6H (in/out reports for FDATR and TelDebt);
- PHX 11 through 16 (BOA corporate resolutions and signature cards for Direct Media Power accounts);
- Bank statements: PHX 17A, PHX 19J, PHX 19K, PHX 29B, PHX 30B, PHX 31B, PHX 34E, PHX 35B, PHX 37B, PHX 38B, and PHX 39B
- PHX 42 through 44 (W-2s and tax returns for Direct Media Power employees)
- PHX 59A through 59I (recordings of calls made and received on Tucci's office line on November 11)

When these exhibits were presented at the hearing, the parties agreed to abide by the protective order in place in the *Radio One* Litigation. *Radio One, Inc. v. Direct Media Power, Inc.*, No. 16 C 1867 (Dkt. 73) (N.D. Ill. Oct. 26, 2017) (Agreed Confidentiality Order). The parties have also represented their willingness to enter a protective order in this matter. *See* (Dkt. 56) at ¶ 2; *id*. at 4. Seeing that the case now is headed into additional discovery, the Court rules as follows. The disputed exhibits shall be maintained under seal until October 10, 2018. On that date, counsel shall submit a proposed agreed confidentiality order to be entered in this case to the

52

Court's Proposed Order email inbox. On this same date, counsel also shall re-designate the disputed exhibits as appropriate under the proposed agreed confidentiality order and shall officially file all of the exhibits on the docket either under seal, with redaction, or as-is as agreed. The only exception to this order is for exhibits that are too large for the Court's filing system. Those large exhibits will continue to be maintained by the Court on the thumb drives provided by counsel for Urban One. Accordingly, the parties' sealing motions (Dkts. 51, 56) are granted in part and denied in part.

## CONCLUSION

For these reasons, the Court hereby finds that it has subject matter jurisdiction over this matter and the necessary authority to enter a preliminary injunction; thus, Tucci's Motion to Dismiss (Dkt. 31) and Motion to Strike (Dkt. 22) are denied.

The Court further finds that issuing this preliminary injunction (Dkts. 7, 8) is appropriate because Urban One has demonstrated that its case has a likelihood of success on the merits; no adequate remedy at law exists; and Urban One will suffer irreparable harm if the Preliminary Injunction is not granted. Urban One has proved a *prima facie* case to pierce the corporate veils of Direct Media Power and DMP Holdings so as to hold Tucci personally liable for the default judgment entered in the *Radio One* Litigation because it has demonstrated that (1) there is such unity of interest and ownership between Tucci and both companies that the separate personalities of the corporations and Tucci no longer exist; and (2) allowing Tucci to hide behind either DMP Holdings or Direct Media Power would sanction a fraud and promote injustice on account of his efforts to keep Direct Media Power's assets out of reach and prevent Urban One from collecting on its judgment.

Moreover, this harm to Urban One outweighs any harm to Tucci in being temporarily restrained and the public interest is served by the entry of this Order. Accordingly, this Court orders that:

1. Until further order of the Court, Dean Tucci's assets are frozen with the exception of normal necessary living expenses to include reasonable attorney expenses, which the Court may review upon motion by Urban One or upon *sua sponte* order of the Court.

2. Pursuant to Federal Rule of Civil Procedure 65(c), Urban One deposit ten thousand dollars ($10,000) with the Court as payment of such damages as Tucci may be entitled to recover as a result of a wrongful restraint hereunder.

Should the parties wish to revise the preliminary injunction, they may move to do so upon a showing that the modification has benefits for them and for the public interest. *See Commodity Futures Trading Comm'n v. Battoo*, 790 F.3d 748, 751 (7th Cir. 2015).

Further, the sealing motions (Dkts. 51, 56) are granted in part and denied in part. Counsel shall submit a proposed agreed confidentiality order on or before October15, 2018 and shall also file re-designated hearing exhibits on this Court's docket.

Hon, Virginia M. Kendall
United States District Judge

Date: September 30, 2018