IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| URBAN ONE, INC., | ) |
| *Plaintiff,* | ) ) ) |
| v. | ) No. 17 C 7892 ) ) Judge Virginia M. Kendall |
| DEAN TUCCI, | ) ) |
| *Defendant.* | ) ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Urban One, Inc. is a corporation that owns and operates radio stations. (Dkt. 108 ¶ 1.) Urban One previously brought a lawsuit against Direct Media Power, Inc. when DMP failed to pay Urban One after using their services. (*Id.* at ¶ 5; *Radio One, Inc. v. Direct Media Power, Inc.*, Case No. 16-cv-01867 (N.D. Ill.) (the "Contract Litigation.") The Contract Litigation resulted in a default judgment against DMP and in favor of Urban One. (Dkt. 108 ¶ 6.) DMP has not paid the judgment and so Urban One brings the current action in an attempt to pierce the corporate veil and sue for fraud to hold defendant Dean Tucci personally liable. (Dkt. 1.) Urban One now moves for summary judgment on these claims. (Dkt. 106).

**BACKGROUND**

The below facts come from Urban One's Rule 56.1 Statement of Facts. (Dkt. 108.) Tucci failed to respond to the facts and therefore the Court deems the facts admitted. *See* Local Rule 56.1(b)(3)(C).

Urban One is a Delaware corporation with its principal place of business in Silver Springs, Maryland, that operates radio stations and sells airtime for broadcast commercials. (Dkt. 108 ¶ 1.) On February 2, 2016, Urban One filed its above-mentioned Contract Litigation, which sought to recover more than $1.3 million for airtime that Urban One provided to Direct Power Media, Inc. clients but for which DMP failed to pay. (*Id.* ¶ 5.) The Contract Litigation resulted in a default judgment against DMP and in favor of Urban One on October 26, 2016 in the amount of $1,398,658.58, plus post-judgment interest. (*Id.* ¶ 6.) That judgment remains unpaid.

Dean Tucci, an Illinois citizen, started DMP in 2010 and was its sole owner until February 2016, when ownership was transferred to a Tucci-controlled holding company after Urban One filed the Contract Litigation against DMP. (*Id.* ¶ 7.) DMP was a media liquidation company that would purchase unsold radio airtime at a discount and sell that time to its clients. (*Id.*) In May 2013, Tucci re-incorporated DMP in Illinois and obtained a new Employee Identification Number, which was used for all business operations, payroll, and vendors after the reincorporation. (*Id.*) Tucci served as the President and CEO of DMP, as well as the sole member of its board of directors. (*Id.* ¶ 8.) He was involved in all decisions DMP made and had complete control over its operations. (*Id.* ¶ 9)

Tucci incorporated several companies, including FDATR, Inc, which was known as TelDebt Solutions, Inc., which was a tax settlement and resolution company that later expanded to student loan consolidation. (*Id.* ¶¶ 18-20.). Tucci also

2

established Dang Enterprise and Media Liquidators as limited liability companies in New Mexico. (*Id.* ¶¶ 28-30). Tucci established DMP Holdings, Inc. ("Holdings") on February 25, 2016, a few weeks after Urban One sued DMP in the Contract Litigation. (*Id.* ¶¶ 31-32). Tucci transferred his ownership interest in DMP and FDTAR/TelDebt to Holdings. (*Id.* ¶¶ 32-33). Holdings did not have a bank account until more than a year after it was established. (*Id.* ¶ 34). Holdings did not abide by corporate formalities and had no financial records, never had a formal board of directors meeting, and never paid dividends. (*Id.* ¶ 36). Tucci owns 90% of Holdings and his girlfriend, Beatta Piliciauskiene, owns the remaining 10%, though she gave no consideration for her ownership interest. (*Id.* ¶¶ 36-37). The Board of Directors of Holdings included Tucci, Tucci's two children, and Piliciauskiene. (*Id.* ¶ 38).

Tucci ran all of his affiliated companies together. (*Id.* ¶ 40.) DMP and FDATR/TelDebt were all operated out of two adjacent office suits in Wood Dale, Illinois. (*Id.* ¶ 41.) They shared a single computer server for their businesses, and FDATR/TelDebt's employees were on DMP's health insurance plan. (*Id.* ¶ 42.) At times, Tucci paid DMP payroll out of FDATR/TelDebt and vice versa. (*Id.* ¶ 43.) And Tucci indiscriminately made intercompany transfers among his various entities, with no formality, corporate documentation, or business purpose. (*Id.* ¶ 44.) Tucci consistently transferred hundreds of thousands of dollars among the different entities and his personal accounts as he saw fit on a "need-to-need" basis without any formal documentation. (*Id.* ¶ 45.) As Tucci's assistant testified, "[e]ssentially money would move, depending on whichever business was bringing in more cash flow that day. If

3

FDATR had a good day and we needed to make payroll or pay something for [DMP], then there would be money moved. It would usually be a check cut . . . moving money from FDATR to [DMP] or from [DMP] to Dang Enterprises, Dean Tucci, wherever it needed to go." (*Id.* ¶ 46.) These transfers were not loans and were not made for any legitimate business purpose. (*Id.* ¶ 47.) There was no agreement regarding the use of the funds – they could have been used for any purpose. (*Id.*) Tucci transferred several hundred thousand dollars from DMP to FDATR/TelDebt alone in 2016. (*Id.* ¶ 48.)

Tucci admits to commingling funds between the various Tucci-affiliated entities (i.e., DMP, FDATR, Dang, and TelDebt), including paying DMP debts and expenses out of the other affiliated entities. (*Id.* ¶ 49.) For example, in mid-March 2017 through May 2017, FDATR/TelDebt paid $116,513 of DMP debt. (*Id.* ¶ 50.) And between October 31, 2016 and November 6, 2016, DMP transferred around $261,000 to FDATR/TelDebt, which then transferred $85,000 to Dang. (*Id.* ¶ 51.) During these transfers, DMP and the other Tucci entities, including FDATR/TelDebt, were not doing business together nor were there any agreements among the different entities for transfers made in and out of the companies. (*Id.* ¶ 52.)

Tucci also transferred funds from DMP and his other businesses to himself, his children, his girlfriend, and his ex-wife whenever he desired. (*Id.* ¶ 53.) He had checks cut directly to himself "from all entities on a . . . need-to-need basis, whenever he needed something." (*Id.* ¶ 54.) Tucci testified that it was his understanding that "[i]f I borrow money on the firm and I want to pay myself, I can." (*Id.* ¶ 55.) Despite

4

advising the bankruptcy court that he never took funds out of DMP other than his $78,000 salary, DMP transferred more than $100,000 outside of his salary to Tucci the year he stopped being a shareholder at DMP, and he likewise received an additional $100,000 that year in transfers from FDATR/TelDebt for no legitimate purpose. (*Id.* ¶ 57.) From January 2016 to March 2017, Tucci received non-salary-related funds from DMP, Dang, FDATR, and TelDebt totaling $274,461.96. (*Id.* ¶ 58.) Tucci's Spreadsheets note these personal transfers as "Intercompany Transfers." (*Id.*) The transferred funds were not commissions because Tucci had no agreement to receive commissions. (*Id.* ¶ 59.) Nor were they distributions or dividends because Tucci was not a shareholder of DMP after February 26, 2016, and Tucci admitted that DMP and Holdings never paid any dividends. (*Id.*) Tucci also made transfers out of DMP to support his girlfriend Piliciauskiene, granting her an annual salary of $60,000 from DMP, even though she did no work for the company. (*Id.* ¶ 60.) In 2016 alone, Tucci transferred more than $99,000 from DMP to the primary personal account he and Beata jointly owned and more than $65,000 into another joint personal account with Beata. (*Id.* ¶ 61.) Piliciauskiene received deposits into her direct accounts from both DMP and FDATR/TelDebt. (*Id.*) But Tucci's personal use of corporate money did not stop there. DMP also cut checks to support Tucci's ex-wife for $4,400 each month. (*Id.* ¶ 63.)

Tucci additionally used the sham corporate structure specifically to avoid payment of the Judgment. (*Id.* ¶ 64.) After the Judgment, Tucci emptied the company's U.S. Bank accounts to avoid collection efforts. (*Id.*) Tucci began

5

transferring hundreds of thousands of dollars out of DMP to other Tucci-owned entities and himself personally. (*Id*.) Within five days of the Judgment, Tucci had transferred $184,000 out of DMP. (*Id.* ¶ 65.) Within 21 days, Tucci had transferred more than $391,000 out of DMP, including more than $354,000 to Dang, a non-operational entity. (*Id*.) On November 10, 2016, Urban One issued a Citation to Discover Assets on Tucci (the "Citation"). (*Id.* ¶ 66.) Urban One served the Citation on DMP on November 11, 2016, with the Citation examination scheduled for November 21, 2016 at 9:00 a.m. (*Id*.) Receiving the Citation did not alter Tucci's behavior – his transfers of DMP's assets continued unabated. (*Id*.) When Tucci learned of the Citation, he declared that "Radio One [Urban One] is not going to tell him how to run his business, and that F them, he'll do what he wants to do." (*Id* ¶ 67.) Tucci texted his assistant the night the Citation was served that "I don't need [Urban One's counsel] trying to fuck us, we should move the bank accounts on Monday." (*Id*.) He then instructed his assistant to set up new bank accounts at Citibank in the names of Dang and FDATR/TelDebt to collect DMP's revenues from clients. (*Id.* ¶ 68.) Tucci ordered his assistant to change the bank accounts linked to DMP's merchant accounts so DMP's revenues would deposit into a bank account for one of Tucci's other entities. (*Id*.) He thereafter transferred $152,500 to Dang and $1,500 to himself personally. (*Id*.) In the year following the Judgment, Tucci improperly transferred more than $1 million out of DMP, including more than $510,000 to Dang, more than $500,000 to FDATR/TelDebt, and more than $13,000 to himself directly. (*Id.* ¶ 70.)

To avoid collection efforts, Tucci caused DMP to file for protection under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Case"). (*Id.* ¶ 71.) Throughout the bankruptcy, however, Tucci continued to transfer more than $475,000 out of DMP to Dang, TelDebt, and himself for personal gain. (*Id.* ¶ 72.) Indeed, in its 2018 contempt order, the bankruptcy court found that Tucci violated cash collateral orders by comingling its cash and transferring funds out of DMP to affiliated entities. (*Id.*) The Bankruptcy Court held that despite the specific prohibition on such transfers in the cash collateral orders, "Tucci continued to transfer funds as he pleased between himself, DMP and Affiliated Entities." (*Id.*) In May 2017, the bankruptcy was converted to a Chapter 7, and it was ultimately dismissed on September 21, 2017. (*Id.* ¶ 73.)

Urban One filed the instant case on November 1, 2017, asking the Court to pierce the corporate veil and hold Tucci personally liable. (*Id.* ¶ 74). At the same time as its Complaint, Urban One filed a motion for temporary restraining order and preliminary injunction. (*Id.*) The Court granted Urban One's temporary restraining order and, in January 2018, held a three-day preliminary injunction hearing. (*Id.*) Tucci repeatedly lied during the hearing about his prior admissions. (*Id.* ¶ 75.) Tucci additionally misled this Court about the circumstances surrounding his receipt of the Citation on DMP. (*Id.* ¶ 76.)

## **LEGAL STANDARD**

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see, e.g., Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473,

7

485 (7th Cir. 2019). The parties genuinely dispute a material fact when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Daugherty v. Page*, 906 F.3d 606, 609–10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In determining whether a genuine issue of fact exists, the Court must take the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Anderson*, 477 U.S. at 255; *see also Zander v. Orlich*, 907 F.3d 956, 959 (7th Cir. 2018).

## DISCUSSION

### I. Piercing the Corporate Veil

Urban One first urges the Court to pierce the corporate veil and allow Tucci to be held personally liable for the prior judgment, arguing that there is such a unity of interest and ownership among Tucci, DMP, and Holdings that the separate personalities of DMP and Holdings no longer exist; and that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice. (Dkt. 107 at 12.) Corporations exist separately from their owners and the corporate veil allows an entity's investors to limit their liability and encourage investment. *Laborers' Pension Fund v. Lay–Com, Inc.*, 580 F.3d 602, 610 (7th Cir. 2009). A court may pierce a corporation's veil and hold individuals personally liable for the underlying claim if the corporate form "is used as a cloak or cover for fraud or illegality, to work an injustice, to defend crime, or to defeat an overriding public policy, or where necessary to achieve equity." *Wachovia Securities, LLC v. Banco*

8

*Panamericano, Inc.*, 674 F.3d 743, 751-52 (7th Cir. 2012) (citing 18 *Am.Jur.2d Corporations* § 57 (footnotes omitted)).

Illinois law permits corporate-veil piercing when two separate prongs are met: "(1) there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist; and (2) circumstances must be such that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice." *Wachovia Securities*, 674 F.3d at 751-52. As outlined below, Urban One can show that there are no genuine issues of material fact remaining with regards to either prong, so its motion for summary judgment on this count is granted.

### A. Urban One can show unity of interest and ownership

Under Illinois law, when determining whether a unity of interest and ownership exists, as required to pierce the corporate veil, courts look at the following factors: (1) inadequate capitalization; (2) failure to issue stock; (3) failure to observe corporate formalities; (4) failure to pay dividends; (5) corporate insolvency; (6) nonfunctioning corporate officers; (7) missing corporate records; (8) commingling of funds; (9) diversion of assets to owner or other entity to creditor detriment; (10) failure to maintain arm's-length relationship among related entities; and (11) whether corporation is mere façade for a dominant owner. *Id.* at 752.

Here, Urban One has laid out sufficient undisputed facts to permit piercing of the corporate veil. First, Urban One has shown that DMP had inadequate capitalization and could not pay its bills on its own, instead relying upon inter-

9

company transfers. (Dkt. 107 at 15; Dkt. 108 at ¶¶ 44-47). Tucci additionally testified that DMP was insolvent (*Id.*; Dkt. 108 ¶ 80). Holdings was never capitalized at all, did not have a bank account until more than a year after its formation, and never maintained a balance in any account. (*Id.*; Dkt. 108 ¶ 34). Tucci paid nothing for his interest other than his contribution of the assets of DMP and FDTAR/TelDebt, while his girlfriend received her share with no monetary contribution at all. (*Id.*; Dkt. 108 ¶ 37).

Additionally, Tucci has not produced stock certificates for DMP or Holdings, even though Urban One requested such information. (Dkt. 107 at 15; Dkt. 108 ¶14). Tucci admitted that neither DMP nor Holdings ever paid any dividends. (Dkt. 107 at 16; Dkt. 108 ¶¶ 36, 59). Urban One also shows that DMP and Holdings failed to observe corporate formalities and had an absence of corporate records. They did not convene board of director meetings, they failed to maintain or produce a shareholder agreement, they failed to maintain a corporate minute book, and they failed to maintain legitimate records of transactions among Tucci's companies. (Dkt. 107 at 16; Dkt. 108 ¶¶ 13, 36, 47, 52). DMP and Holdings also did not file income tax returns for 2014, 2015, 2016 and 2017 until the IRS created substitute returns as part of a 2017 audit. (*Id.*; Dkt. 108 ¶ 80). Urban One also shows that Tucci led the operations of DMP and Holdings with no other functioning officers or directors. (Dkt. 107 at 17; Dkt. 108 ¶¶ 9-12). Tucci managed and controlled Holdings with no input from his girlfriend, whom he gave a 10% share. (*Id.*; Dkt. 108 ¶38).

Urban One's undisputed facts also show that Tucci commingled funds, diverted assets from DMP to himself, and failed to maintain arm's-length relationship among related entities. (Dkt. 107 at 18; Dkt. 108 ¶¶ 40-52; 75.) Finally, Urban One shows that DMP and Holdings were facades for Tucci's operations, using DMP funding for personal reasons and creating Holdings to hide DMP's assets from Urban One. (Dkt. 107 at19; Dkt. 108 ¶¶ 31-33, 40-46, 53-57.) Due to the above undisputed facts, Urban One has shown that there are no material facts at issue over whether there was unity of interest and ownership among DMP, Holdings and Tucci.

### B. Adherence to the fiction of separate corporate existence would sanction fraud and promote injustice

Under the second prong of the veil piercing test, Urban One must show "that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice." *Wachovia Sec.*, 674 F.3d at 752. To support this prong, Urban One brings a common law fraud claim that fails for the reasoning discussed below. However, the test does not require an affirmative showing of fraud, but rather something more than the mere prospect of an unsatisfied judgment." *Id.* (quoting *Hystro Products, Inc. v. MNP Corp*, 18 F.3d 1384, 1390 (7th Cir. 1994)). Illinois law allows veil piercing to avoid unfair enrichment, permitting the creator of a liability and cause of the inability to meet that liability to escape responsibility, and to avoid allowing a corporation to keep assets in a liability-free corporation while placing liabilities on an asset-free corporation among other reasons. *Id.* At issue here is the unpaid judgment, which is not sufficient by itself to sanction a fraud or promote injustice. *See Sea-Land Services, Inc. v. Pepper Source*, 941 F.2d

11

519, 522-23 (7th Cir. 1991) (summarizing cases where this second prong is met). However, Tucci has created a number of businesses in order to escape liability for the judgment he owes to DMP. Adhering to the corporate form would work an injustice upon Urban One as it would allow Tucci to "keep assets in a liability-free corporation while placing liabilities on an asset-free corporation." *Wachovia Sec.*, 674 F.3d at 756. The undisputed facts here show that Tucci has spun an intricate web of companies in order to escape paying Urban One its fair due. Due to this, Urban One has demonstrated sufficient facts to show that the corporate veil should be pierced. Summary judgment is granted on this count.

**II.   Common Law Fraud**

Under the second prong of the *Wachovia* test, Urban One must show "that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice." *Wachovia Securities*, 674 F.3d at 752. Having found that the corporate veil may be pierced because not doing so would sanction a fraud or promote injustice, the Court now turns to Defendant's common law fraud claim.

Common law fraud is established when a defendant knowingly made a false statement of material fact with the intent to induce the plaintiff and that plaintiff justifiably relied on the statement and suffered damages resulting from his reliance. *Ass'n Ben. Servs. v. Caremark Rx, Inc.*, 493 F.3d 841, 853 (7th Cir. 2007); *see also Check v. Clifford Chrysler-Plymouth of Buffalo Grove, Inc.*, 794 N.E. 2d 829, 835 (Ill. App. 2003) (listing the elements of common law fraud as: (1) a false representation of a material fact; (2) by a party who knows or believes it to be false; (3) with the

12

intent to induce a plaintiff to act; (4) reliance on the statement by the plaintiff; and (5) injury to the plaintiff as a result of that reliance.) Fraudulent conduct "may also be based on the omission or concealment of a material fact if accompanied by the intent to deceive under circumstances which create the opportunity and duty to speak." *Wachovia Securities, LLC v. Neuhauser*, 528 F.Supp.2d 834, 851-52 (N.D. Ill. 2007). Urban One argues that Tucci's conduct, i.e. his knowingly improper financial transfers, the violations of the bankruptcy court's order, his disregard for the Citation, and his false testimony shows that he defrauded Urban One. (Dkt. 107 at 21.)

The entirety of Tucci's conduct and statement to Urban One were misrepresentations of his wealth in order to get Urban One to believe that they could not recover from him. Not only did Tucci falsely testify to the bankruptcy judge, he falsely testified in this Court repeatedly while on the witness stand. He falsely stated that outside of his salary he had not received any other funds; that he did not know what commingling meant; that he never received the Citation to Discover Assets; that he had only arrived at his office at 5:36 that evening (when phone records show otherwise). (*See* Dkt. ¶¶ 108 15, 75-76). This is just smattering of the multiple statements and misrepresentations made to this Court which led to the obvious conclusion based on his evasive and flippant demeanor and the testimony that he was lying. These false statements of lack of financial ability were made prior to the lawsuit to lull Urban One into believing that any efforts on their part to attempt to recover in the contract lawsuit would fail; any efforts to put funds in a bankrupt

13

estate would fail; and finally any effort to obtain funds based on this summary judgment would fail. Urban One has been damaged in having to pay countless attorneys fees and costs in an effort to redress this injustice. Urban One is entitled to summary judgment on the common law fraud count.

## CONCLUSION

Urban One statement of material facts, which is not disputed by Tucci, shows that they are entitled to judgment as a matter of law on both counts and are permitted to pierce DMP and Holding's corporate veil and hold Tucci personally liable. Urban One's Motion for Summary Judgment [106] is therefore granted

_____
Virginia M. Kendall
United States District Judge

Date: April 1, 2020

14